RIVERSIDE NATIONAL BANK et al., Petitioners,

v.

James LEWIS, Respondent.

No. B–8046.

Supreme Court of Texas.

June 18, 1980.

Rehearing Denied July 16, 1980.

Barrow, Bland & Rehmet, Charles J. Wilson and Kenneth C. Raney, Jr., Houston (on appeal only), for petitioners.

Haynes & Fullenweider, Robert B. Wallis and Jan Woodward Fox, Houston, for respondent.

GREENHILL, Chief Justice.

This case primarily involves the question whether one who seeks a loan from a bank in order to refinance a car qualifies as a "consumer" under the Deceptive Trade Practices Act (DTPA).[1] The trial court disallowed recovery under the DTPA, but the court of civil appeals reformed the judgment to hold the bank liable under the DTPA. 572 S.W.2d 553. Since we believe

---

1. All statutory references are to Vernon's Texas Business and Commerce Code, unless otherwise noted. The DTPA is found in section 17.41 *et seq.* Other statutory references are to Vernon's Texas Revised Civil Statutes Annotated. All emphasis is ours.

that Mr. Lewis was not a "consumer" in the instant transaction, we hold that the trial court correctly denied recovery under the DTPA. We also hold that under this record, Lewis is entitled to recover from Riverside Bank upon his cause of action for common law fraud. Further, we hold that there is some evidence to support recovery of exemplary damages for fraud. We remand the cause to the court of civil appeals to pass upon the sufficiency of the evidence as to exemplary damages.

The relevant facts are as follows: In February, 1975, Lewis purchased a new Cadillac El Dorado. Allied Bank provided almost $10,500.00 in financing. To secure the loan, Allied Bank took a security interest in the car and kept a $6,000.00 certificate of deposit as security. Lewis failed to make the first payment due on April 10, and a check that he gave a few days later was returned for insufficient funds. After these occurrences, Mr. Little, Lewis' loan officer at Allied Bank, asked Lewis to move the loan to another bank.

After two unsuccessful attempts to refinance the loan, Lewis went to Riverside Bank on May 2. Arthur Carroll, a junior loan officer, helped Lewis complete a loan application, and told Lewis that the application would have to be approved by his superiors at the Bank. At that time, Carroll called the Allied Bank loan officer, Mr. Little, and told him that Lewis had applied for the loan at Riverside Bank.

On May 6, 1975, Carroll called Little once again. During this phone conversation, Carroll informed Little that the loan had been approved, and requested Little to have Allied Bank forward a draft, the title, and the certificate of deposit to Riverside Bank. After forwarding these items, there was no communication between Little and Carroll until May 14, 1975.

On May 14, Little called Carroll in order to determine why the draft had not been paid. Carroll told Little that the draft had been held up due to a senior loan officer's questions, but that it would be paid on the next day. On May 15, Little informed Carroll that he wanted the draft paid immedi-

ately, or returned. Carroll replied that the draft had been paid, and the cashier's check was in the mail. The next day, May 16, Carroll told Little that the draft would not be paid.

During the course of these communications between Little, at Allied Bank, and Carroll, at Riverside Bank, James Means, executive vice-president at Riverside National Bank, did some investigation of Lewis' loan application. Upon calling Allied Bank, Means discovered that Lewis' application misrepresented his net income and did not disclose the fact that he had already failed to make his first, and only, payment. Thus, on May 14, Means decided that Riverside would not make the loan to Lewis.

On May 15, however, Carroll called Lewis, told him that the loan had been approved, and asked him to come to the bank to sign the necessary papers. Lewis complied with the request, signing a promissory note in the amount of $12,871.80 on May 15. This note was kept by Riverside until the time of trial, although it was never sought to be collected. As previously stated, on May 15, Carroll was also representing to Allied Bank that the loan would be taken by Riverside Bank.

After being told on May 16 that Riverside would not take the loan, Allied Bank repossessed the car and sold it at auction. The sale failed to generate sufficient money to cover the full loan at Allied, and a deficiency of $3,177.50 was deducted from Lewis' certificate of deposit, with the balance being returned to him.

Lewis sued Riverside for the losses he suffered in this transaction, claiming that Riverside, through Carroll, had (1) engaged in fraud, (2) breached its contract to loan money, (3) engaged in deceptive trade practices against him, and (4) converted his property by retaining the promissory note, yet refusing to lend him money.

After trial to a jury, the jury found that Riverside had (1) wrongfully dishonored the draft sent by Allied to Riverside, (2) committed fraud on Lewis by refusing to make the loan, and (3) violated the Deceptive

Trade Practices Act by refusing to lend the money. The jury found that Lewis had suffered actual damages in the amount of $3,277.50. As a consequence of finding that Riverside had acted *with malice* in refusing this loan, the jury also found that $10,000.00 should be awarded as exemplary damages. The jury also found that reasonable attorney's fees would be $6,700.00.

The trial court entered judgment for Lewis in the amount of $13,277.50, representing the actual and exemplary damages under the fraud theory of action. The court also held that the DTPA was not applicable to the instant transaction, and declined to enter judgment under the theory of recovery for treble damages and attorney's fees.

On appeal, the court of civil appeals, sitting in Houston, reformed the judgment, and as reformed, affirmed. 572 S.W.2d 553. The Houston court held that: (1) Lewis was not entitled, under the pleading and proof, to recover under the theory of wrongful dishonor; (2) Lewis did establish his cause of action under the fraud theory, but that there was no evidence of malice that could justify the jury's award of exemplary damages; (3) Lewis' transactions with Riverside Bank were covered by the Deceptive Trade Practices Act, and that he was thus entitled to treble damages plus attorney's fees. Thus, the Houston court entered judgment for Lewis in the amount of $16,562.50, representing $9,862.50 as treble damages under the DTPA and $6,700.00 as attorney's fees.

Both Riverside and Lewis have perfected writs of error to this Court. Riverside contends that the court of civil appeals erred in holding that Lewis could recover under the DTPA for its failure to loan money, as promised. Lewis contends that the court of civil appeals erred in holding that there was no evidence of malice to support the award of exemplary damages. We agree with both pa ties' contentions; i. e., that there is some evidence to support a recovery of exemplary damages, but that Lewis does not have a cause of action under the Deceptive Trade Practices Act.

## RIVERSIDE'S LIABILITY UNDER THE DECEPTIVE TRADE PRACTICES ACT.

The alleged deceptive acts in this case occurred during May, 1975. Accordingly, the statutory provisions that govern this case are those that were in effect *at the time* that the alleged deceptive acts occurred. *See Woods v. Littleton*, 554 S.W.2d 662, 666 (Tex.1977). At the time of these actions, the pertinent parts of the Act read as follows:

Sec. 17.44. Construction and Application.

This subchapter shall be liberally construed and applied to promote its underlying purposes, which are to protect *consumers* against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection.

Sec. 17.45. Definitions.

As used in this subchapter:

(1) "Goods" means tangible chattels bought for use.

(2) "Services" means work, labor, and services for other than commercial or business use, including services furnished in connection with the sale or repair of goods.

(3) "Person" means an individual, partnership, corporation, association, or other group, however organized.

(4) *"Consumer"* means an individual who seeks or acquires by purchase or lease, any *goods or services.*

. . . . .

(6) "Trade" and "commerce" mean the advertising, offering for sale, sale, lease, or distribution of any good or service, of any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value, wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this state.

. . . . .

Sec. 17.46. Deceptive Trade Practices Unlawful.

.

(a) False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

. . . . .

Sec. 17.47. Restraining Orders.

(a) *Whenever* the *consumer protection division* has reason to believe that *any person is engaging in, has engaged in, or is about to engage in any act or practice declared to be unlawful by this subchapter,* and that proceedings would be in the public interest, *the division may bring an action* in the name of the state *against the person to restrain* by temporary or permanent injunction *the use of such method, act, or practice.*

. . . . .

Sec. 17.50. Relief for *Consumers.*

(A) A *consumer* may maintain an action if he has been adversely affected by any of the following:

(1) the use or employment by any person of an act or practice declared to be unlawful by Section 17.46 of this subchapter . . . .

Texas Laws 1973, chapter 143, section 1, at 322–326.

The Act thus differentiates between the remedies available to correct violations of the Act. A "person" may have engaged in a deceptive act by presenting any misleading information concerning *any item of value. See* sections 17.46(a), 17.45(6). Any person engaging in such deceptive practices may be subjected to a suit by the Consumer Protection Division of the Attorney General's Office, under section 17.47. But, one who engages in deceptive acts may not be subjected to a private suit for damages under the Act unless the aggrieved party is a *consumer.* Section 17.50 expressly declares, in its caption: Relief for *Consumers.* Furthermore, section 17.50 provides that a *consumer* may maintain a cause of action if aggrieved by deceptive practices. The Legislature granted no such remedy by means of a private cause of action for any *person* ; one must be a *consumer.*

It has been argued that any *person* ought to be permitted to sue if aggrieved by a deceptive act. This contention relies on the broad definition of "trade" and "commerce" and the liberal interpretation of the DTPA that is promoted by section 17.44. We disagree with this position for two reasons. First, the scope of "trade" and "commerce" *defines the acts that are illegal* ; it does not purport to say *who* may maintain a private cause of action. Rather, it is the definition of *consumer* that delineates the class of persons that may maintain a private cause of action. Second, the rule of liberal interpretation should not be applied in a manner that negates the statutory definition of the word "consumer." To ignore the Legislature's definition of "consumer," and permit any aggrieved person to maintain a private cause of action under the DTPA, ignores the well established presumption that legislative choice of words is such that every word has meaning. *See Jessen Associates, Inc. v. Bullock,* 531 S.W.2d 593 (Tex.1975). To read the Act in such a manner that "trade" and "commerce" define the class of persons who are *consumers* would constitute a judicial deletion of section 17.45(4), which defines *consumer* in terms of a purchaser of "goods" and "services," and not in connection with "trade" and "commerce." This we cannot do. Thus, we hold that a person who brings a private lawsuit under section 17.50 *must* be a *consumer,* as defined in section 17.-45(4). The other courts that have considered this issue have been in accord. *See, e. g., Hi-Line Electric Co. v. Travelers Insurance Co.,* 587 S.W.2d 488 (Tex.Civ.App.—Dallas 1979), *writ ref'd n. r. e.,* 593 S.W.2d 953 (1980) (per curiam); *Russell v. Hartford Casualty Insurance Co.,* 548 S.W.2d 737 (Tex.Civ.App.—Austin 1977, writ ref'd n. r. e.).

In his transaction with Riverside Bank, Lewis sought only to borrow money in an effort to avoid repossession of his car. He sought to pay for the use of money over a period of time. Other than Lewis' payment for the use of money, there was nothing else for which he paid, or which he sought to acquire. In order to determine whether Lewis was a "consumer" entitled to main-

tain a private cause of action under section 17.50 of the DTPA, we must determine whether, in this transaction, Lewis sought or acquired "by purchase or lease, any goods or services."

1. *Lewis did not seek or acquire any "goods" in his transaction with Riverside Bank.*

Section 17.45(1) of the DTPA defines goods as "tangible chattels bought for use." Since Lewis sought nothing other than the use of money from Riverside Bank, it is necessary to determine whether money was a "tangible chattel" that could be classified as a good. After examination of the appropriate statutes, we conclude that money is not such a "good."

Nowhere in the DTPA is "chattel" defined so as to specifically include or exclude "money" from the definition of "goods." A cursory examination of analogous statutes, however, demonstrates that money has not yet been included in the category of "goods" or "chattels."

■ The DTPA is a part of the Texas Business and Commerce Code. Accordingly, it is appropriate to look to other sections of the Code to determine the proper characterization of money. Section 1.201 of the Texas Business and Commerce Code, which sets forth the general definitions of the terms used in the Code, provides:

(24) *"Money"* means a medium of exchange authorized or adopted by a domestic or foreign government as a part of its currency.

A specific definition of "goods" is found in section 2.105, which provides:

(a) "Goods" means all things . . . which are movable at the time of identification to the contract for sale *other than the money* in which the price is to be paid . . . .

Section 9.105(a)(8) similarly provides:

(8) "Goods" includes all things which are movable at the time the security interest attaches or which are fixtures . . . but *does not include money* . . . .

Thus, consistent with these analogous statutory provisions, we hold that money is not a "tangible chattel," or "goods" as defined by the DTPA. Rather, money is properly characterized as a currency of exchange that enables the holder to acquire goods. Thus, Lewis, in arranging for the instant loan, did not seek to acquire, through purchase or lease, any "goods" as defined by the DTPA.

2. *Lewis did not seek or acquire any "services" in his transaction with Riverside Bank.*

Section 17.45(2) of the DTPA defines services as "work, labor, and services for other than commercial or business use, including services furnished in connection with the sale or repair of goods." Lewis contends that, in the instant transaction, he sought an "extension of credit." This extension of credit, he claims, is a service as defined by the DTPA. We disagree.

■ In this case, Lewis sought to borrow *money*: he sought nothing else. Money, as money, is quite obviously neither work nor labor. Seeking to acquire the use of money likewise is not a seeking of work or labor. Rather, it is an attempt to acquire an item of value. We hold that an attempt to borrow money is not an attempt to acquire either work or labor as contemplated in the DTPA.

■ "Services" was defined by this Court in *Van Zandt v. Fort Worth Press*, 359 S.W.2d 893, 895 (Tex.1962). We defined services as: "action or use that furthers some end or purpose: conduct or performance that assists or benefits someone or something: deeds useful or instrumental toward some object." This definition described "services" in terms of "action," "conduct," "performance" and "deeds." All of these synonyms demonstrate that services includes *an activity* on behalf of one party by another. This characterization indicates that "services" is similar in nature to work or labor.[2] Accordingly, we hold

---

2. This is consistent with the "familiar principle of statutory construction that words grouped in a list should be given related meaning." *Third National Bank v. Impac Limited Inc.*, 432 U.S.

that Lewis' attempt to acquire money, or the use of money, was not an attempt to acquire services.

■ We find support for our conclusion that the DTPA's use of the word "services" did not include the extension of credit, or the borrowing of money, in another statute: the Home Solicitations Transactions chapter of the Interest-Consumer Credit-Consumer Protection Title.[3] In the Home Solicitations Transactions Act,[4] the Legislature gave to "consumers," *as defined in that act,* certain rights with respect to contracts that had been signed as a result of a home solicitation. *In that act,* the Legislature defined "consumer" as "an individual who seeks or acquires real or personal property, services, *money, or credit* for personal, family, or household purposes." Article 5069–13.01(2). Interestingly enough, the Legislature enacted this statute during the same session in which the DTPA was originally enacted. The presence of the words "money or credit" within the definition of "consumer" in the Home Solicitations Act, and their corresponding absence from the analogous provision in the DTPA, indicates that the seeking of an "extension of credit" is *not* the seeking of a "service" as defined in the DTPA. Obviously, the Legislature knew how to include the extension of credit and borrowing of money within the scope of coverage of protective legislation, when it intended to cover such transactions. The simple addition of the words "money or credit" within the definition of "consumer" in the DTPA would have accomplished such a purpose in the DTPA. The Legislature's exclusion of these terms from the DTPA, in light of its contemporaneous inclusion of the same terms in the Home Solicitations Transactions Act, evidences a clear legislative intent that the extension of credit was not to be covered under the DTPA.

■ It has also been argued that in the course of extending credit, Riverside Bank necessarily provided other services to Lewis. These services could have included such things as help in filling out his loan application, financial counseling, and the processing of his loan. It has been contended that these activities constituted "services" as defined by the DTPA, and thus made Lewis a "consumer" who could maintain a private cause of action under section 17.50. We disagree.

The evidence in this case establishes that Lewis approached Riverside Bank with one objective; he sought to acquire money. He attempted to obtain this money by promising to repay the indebtedness in the future, with interest. Put simply, he sought to exchange future amounts of money for that amount which he desired to have in the present. There is no evidence that he sought to acquire anything other than this use of money.

The argument that services existed in the lending of money, and in the process of determining whether to lend money, and were necessarily a part of the interest rate or purchase price of the loan, is not supported by the evidence adduced at trial. This argument, contained in the briefs, is merely hypothetical. There is nothing to support it in the Statement of Facts.

Additionally, Lewis' sole complaint about the transaction concerned the Bank's failure to make him the loan. He has made no complaint concerning the quality of these collateral activities that he now claims constitute a service. In the absence of a claim concerning these collateral activities, we hold that Lewis did not seek either "goods or services" as defined under the DTPA.[5]

312 at 322, 97 S.Ct. 2307 at 2313, 53 L.Ed.2d 368 (1977). *See also* 53 Tex.Jur.2d, *Statutes,* sections 154, 155.

**3.** Article 5069-1.01 et seq.

**4.** Article 5069–13.01 *et seq.*

**5.** Accordingly, we do not pass upon the question whether a bank's misrepresentation concerning its activities, such as the availability of financial counseling, the cost of processing a loan or the ability to pay a customer's monthly bills, could constitute a deceptive act in connection with a sale of "services." We only hold that where those activities are not the subject of the complaint, then the presence of such collateral activities in a transaction otherwise not covered by the DTPA does not subject the parties to liability under the DTPA.

Accordingly, Lewis was not a "consumer" who could bring suit under section 17.50 of the DTPA.

### RIVERSIDE'S LIABILITY UNDER LEWIS' CLAIM FOR FRAUD.

In the course of its opinion, the court of civil appeals specifically rejected Riverside's contention that there was no evidence to support the jury verdict finding that Riverside had committed a fraud upon Lewis. 572 S.W.2d at 559. The court held that there was "sufficient evidence to meet the court's instruction on fraud." *Id.* The court also recited the elements of actionable fraud, as set forth in *Custom Leasing, Inc. v. Texas Bank and Trust Co. of Dallas*, 516 S.W.2d 138 (Tex.1974), and concluded that those "elements were established in our case by undisputed evidence or by jury findings." 572 S.W.2d 559.

In this Court, Riverside has failed to submit a point of error attacking the lower court's holding that there was some evidence of fraud.[6] Thus, we will not review the lower court's judgment insofar as it permits Lewis to recover his actual damages from Riverside on the theory of fraud. *See Life Insurance Company of North America v. First National Bank of Fort Worth*, 464 S.W.2d 362 (Tex.1971).

Lewis, however, has brought forward points of error challenging the lower courts' holding that there was no evidence to support the jury findings of malice, or its award of exemplary damages. 572 S.W.2d at 559–560.

We have previously held that "exemplary damages may properly be awarded when the plaintiff has suffered actual damages as the result of fraud *intentionally committed for the purpose of injuring him.*" *Dennis v. Dial Finance & Thrift Company*, 401 S.W.2d 803, 805 (Tex.1966). In the instant case, Lewis claims that there was at least *some* evidence that Riverside acted in such a manner as to warrant his recovery of exemplary damages. We agree.

There was evidence presented at trial showing that: (1) Arthur Carroll, acting in the scope of his employment, advised James Lewis to put false statements in his loan application; (2) the ultimate reason for Riverside's refusal to lend the money to Lewis was the presence of these false statements within the application; (3) from May 6 to May 15, Arthur Carroll, acting in the scope of his employment with Riverside, consistently represented to Allied Bank and James Lewis that the loan either would be or had been paid; (4) on May 14, James Means decided that Riverside Bank would not make the loan to Lewis, and conveyed this decision to Carroll; (5) on May 15, Carroll had Lewis come to Riverside Bank and sign a negotiable promissory note in the amount of $12,851.80; (6) on May 16, for the first time, Carroll told Allied Bank that the loan would not be approved; (7) there was no communication from Riverside to Lewis, before repossession of the car, stating that the loan had been refused; (8) Riverside Bank never told Lewis the reasons for that refusal; and (9) for two years after the refusal of the loan, Riverside held

Nor do we have before us a case where in connection with a sale of tangible personal property on credit, the seller misrepresents to the buyer the terms of the credit.

6. Riverside has contended that the court of civil appeals erred in holding that the defense of illegality was waived. At oral argument, Riverside contended that this defense would preclude recovery under Lewis' allegations of fraud.

We find it unnecessary to address this contention, since we agree with the court of civil appeals that the illegality defense was waived. Under Rule 94, Texas Rules of Civil Procedure, Riverside was obliged to plead affirmatively its defense of illegality. Although Riverside pleaded that the application contained false statements, there was no allegation that Lewis made these misrepresentations (1) *knowingly*, and (2) with the *specific intent to induce action by the bank.* These are specific elements of the acts proscribed by 18 U.S.C.A. section 1014, the statute on which Riverside Bank sought to rely. *See United States v. Erskine*, 588 F.2d 721 (9th Cir. 1978). Nor was there any allegation that the transaction was illegal. In the absence of pleadings sufficient to give fair notice to Lewis that Riverside intended to rely on the affirmative defense of illegality to avoid liability, Riverside waived this defense.

Lewis' $12,871.80 promissory note, without offering to return it, or marking it void. We believe that this testimony constitutes *some* evidence that Riverside acted with the requisite mental state necessary to support an award of exemplary damages. We do not, and cannot, however, pass upon the question whether this evidence was sufficient to support the jury award for exemplary damages. For determination of this issue, we remand the cause to the court of civil appeals.

The cause of action based upon the Deceptive Trade Practices Act is severed. The holding of the court of civil appeals awarding Lewis $16,562.50 under the Deceptive Trade Practices Act is reversed, and judgment rendered that Lewis take nothing by his claims under the DTPA. The holding of the court of civil appeals that Lewis is entitled to recover actual damages under his allegations of fraud is affirmed. The holding of the court of civil appeals that there was no evidence of malice to support the award of exemplary damages is reversed, and the cause is remanded to the court of civil appeals for further proceedings consistent with this opinion.

Dissenting opinion by CAMPBELL, J., in which POPE, DENTON and SPEARS, JJ., join.

## DISSENTING OPINION

CAMPBELL, Justice.

I dissent.

Riverside contends the Deceptive Trade Practices Act (D.T.P.A.) does not apply to a loan transaction or extension of credit by a bank because:

(1) The Legislature did not intend the D.T.P.A. to apply to lenders.

(2) The trade practices of lenders are regulated by the Consumer Credit Code, Article 5069–1.01, et seq.[1]

(3) Federal regulation of unfair and deceptive trade practices of national banks pre-empts the application of the D.T.P.A.

The majority holds the Act is not applicable because Lewis is not a consumer. I disagree with the contentions of Riverside and the majority holding.

Lewis' action is based on § 17.46(a) of the D.T.P.A. which provides:

False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

*"Trade and Commerce"* is defined in § 17.45(6) as meaning:

The advertising, offering for sale, lease, or distribution of any good or service, of any *property*, tangible or intangible, real, *personal* or mixed, and any *other article, commodity*, or *thing of value*, wherever situated, and shall include *any trade or commerce* directly or indirectly affecting the people of this State.

This very broad definition leaves no doubt the Legislature intended the D.T.P.A. to apply to lending practices or the extension of credit. Money is certainly "property" and it is "personal." If it is not property, then it fits in the category of "any other article, commodity or thing of value." It cannot be said that the banking business is not a trade or commerce and that such trade or commerce does not directly or indirectly affect the people of Texas. It is more apparent that the Act covers loan transactions when the above provisions are considered with the instructions of § 17.44 which provides:

*This subchapter shall be liberally construed* and applied to promote its underlying purposes, which are to *protect consumers against false, misleading, and deceptive business practices, unconscionable actions*, and breaches of warranty and to provide efficient and economical procedures to secure such protection.

Riverside urges the D.T.P.A. is not applicable because it applies only to a consumer who purchases goods and services and a loan transaction is neither. First, I do not agree that the Act is so limited. The definition of "trade and commerce" above quot-

---

1. All statutory references are to Vernon's Texas Civil Statutes Annotated.

ed provides that it shall include any trade or commerce directly or indirectly affecting the people of this State. This includes loan transactions.

Second, Lewis meets the test of "services" and "consumer." The definition of service in § 17.45(2) is of no help in defining the term as it provides *"services"* means "work, labor, *or service* purchased or leased for use . . . ." The broad language of the Act and the mandate that the Act shall be liberally construed compels the construction that a loan transaction is a service. In *Woods v. Littleton*, 554 S.W.2d 662 (Tex. 1977), we quoted with approval the Webster's Third New International Dictionary definition of service as "an action *or use* that furthers some end or purpose: conduct or performance that assists or benefits someone or something; deeds useful or instrumental toward some object." A loan is the obtaining of money to use to further some end or purpose. Lewis was seeking to obtain a loan *to use* to refinance his automobile. "Services" is defined in § 17.45(2) as "service purchased or leased *for use* . . . .."

Having determined that lending money is a service of the trade or commerce of banking, it must now be determined if it is a service that is purchased for use. A loan is the extension of credit based on an agreement to pay interest in return. *Interest is defined* in Article 5069–1.01 as "compensation allowed for *the use* . . . of money." If interest, paid by the borrower to the lender, is compensation for *the use* of money, then the advancement of money *for use* for a specified period of time would be a service purchased *for use* as required by the definition.

Next, Lewis must qualify as a "consumer." It is provided in § 17.45(4) that the term "consumer" means "an individual . . . who seeks or acquires by purchase . . . any . . . services." It is undisputed that Lewis was seeking a loan from Riverside. If Lewis is a consumer under Article 5069–1.01, Consumer Credit—Consumer Protection Act, then he is also a consumer under the Deceptive Trade Practices—Con-

sumer Protection Act. Lewis is a consumer under the Act.

Riverside argues that trade practices of lenders are exclusively regulated by the Consumer Credit Code, Tex.Rev.Civ.Stat. Ann. art. 5069–1.01 et seq. (1971). Riverside points out that the Legislature repealed Article 5069–1.01 et seq., the deceptive trade practices chapter of the Commercial Credit Code, when it amended the D.T.P.A. in 1973. Contrary to Riverside's position, however, this does not necessarily mean the Legislature intended that "the deceptive practices of lenders and the deceptive practices of vendors should be regulated under separate and mutually exclusive statutes." It is undisputed that the deceptive trade practices provisions of the Consumer Credit Code applied to lenders before 1973 and there is no language in the Code indicating that the amendment and movement of those provisions to the Business and Commerce Code in any way changed that result. Similarly, the D.T. P.A. as amended in 1973 and as it now exists, makes no mention of an exclusion for lenders. This lack of specific language of exclusion takes on added significance in view of Section 17.49 which provides for exemptions from the Act without mentioning lenders. Also § 17.43 provides that the remedies of the D.T.P.A. are in addition to any other procedures or remedies provided for in any other law.

Riverside next contends that federal regulation of unfair and deceptive trade practices of national banks pre-empts the application of the Texas D.T.P.A. in this case. National banks are brought into existence under federal legislation, are instrumentalities of the federal government, and are necessarily subject to the paramount authority of the United States. Nevertheless, national banks are subject to the laws of this State unless such laws interfere with the purposes of their creation, tend to impair or destroy their efficacy as federal agencies, or conflict with the paramount law of the United States. *Anderson National Bank v. Luckett*, 321 U.S. 233, 64 S.Ct. 599, 88 L.Ed. 692 (1944); *Jennings v.*

*United States Fidelity & G. Co.*, 294 U.S. 216, 55 S.Ct. 394, 79 L.Ed. 869 (1935); *Lewis v. Fidelity & D. Co.*, 292 U.S. 559, 54 S.Ct. 848, 78 L.Ed. 1425 (1934); *First National Bank v. Missouri*, 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486 (1924). *See also: Citizens' Nat. Bank of Stamford v. Stevenson*, 231 S.W. 364 (Tex.Comm.App.1921, jdgm't adopted).

There is nothing in the Texas D.T.P.A. which interferes with the purposes of the creation of national banks or which would tend to impair or destroy their efficacy as federal agencies. Riverside argues that the application of the D.T.P.A. to national banks conflicts with federal law in that it interferes with the regulatory scheme devised by the federal government to control national banks. Riverside points out that the Federal Trade Commission is expressly denied authority to regulate national banks concerning unfair or deceptive practices, 15 U.S.C.A. § 45(a)(6) (1973); *United States v. Philadelphia National Bank*, 374 U.S. 321, 336, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), and that such power is vested with the Board of Governors of the Federal Reserve System. 15 U.S.C.A. § 57a(f) (1973). This division of regulatory power within the federal government, however, does not reach the issue of state authority to regulate. The denial of authority to the Federal Trade Commission to regulate national banks concerning unfair or deceptive practices in no way precludes the Texas Legislature from setting up its own mechanism to regulate deceptive practices of national banks.

Under 15 U.S.C.A. § 57a(f)(1), the Board of Governors, "[i]n order to prevent unfair or deceptive acts or practices in or affecting commerce . . . by banks" is given the power to promulgate regulations applying the rules of the Federal Trade Commission

Act to national banks. There is no indication that Congress intended the Board to have exclusive jurisdiction in this field, and the D.T.P.A. does not conflict with the federal law to the extent that they cannot both stand in the same area. *Double Eagle Lubricants v. State of Texas*, 248 F.Supp. 515 (N.D.Tex.1965), *appeal dismissed* 384 U.S. 434, 86 S.Ct. 1601, 16 L.Ed.2d 670 (1966), *rehearing denied* 385 U.S. 890, 87 S.Ct. 13, 17 L.Ed.2d 122 (1966). In fact, the prohibition of "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce" is in harmony with the above quoted language from the federal act. The D.T.P.A. applies to banks, and its application to national banks is not in conflict with federal law.[2]

POPE, DENTON and SPEARS, JJ., join in this dissent.

**2.** The 65th Legislature, 1979, amended the Act by providing that treble damages may be had only on a finding by the trier of fact that any of the acts set out in § 17.46(b) were knowingly committed. Sections 17.50(a)(1) and 17.-50(b)(2). Also § 17.46(a) was amended to provide:

False, misleading, or deceptive acts or practices in the conduct of any trade or com-

merce are hereby declared unlawful and are subject to action by the consumer protection division under Sections 17.47, 17.58, 17.60, and 17.61 of this code.

After the effective date of these amendments, damages are allowed consumers only under the enumerated acts of § 17.46(b) and treble damages are allowed only if the acts were knowingly committed.