**FIRST INTERSTATE BANK OF
BEDFORD, Appellant,**

v.

**Vernon E. BLAND, Appellee.**

No. 2–89–103–CV.

Court of Appeals of Texas,
Fort Worth.

May 14, 1991.

Law, Snakard & Gambill, Steven D. Goldston, Fort Worth, for appellant.

Kenneth G. Mahaffey, Decatur, for appellee.

Before FARRIS, LATTIMORE and MEYERS, JJ.

## OPINION

LATTIMORE, Justice.

Appellant, First Interstate Bank of Bedford, f/k/a Allied Bank Bedford ("Bank"), defendant below, appeals a judgment rendered in favor of appellee, Vernon E. Bland. The jury found that a certain tract of land was appellee's homestead and the trial court declared appellant's deed of trust lien on said land was void.

We affirm.

Appellee brought suit seeking an injunction against appellant to prohibit foreclosure on the Alvord property. Appellee also asserted a claim under the Deceptive Trade Practices Act ("DTPA"), TEX.BUS. & COM.CODE ANN. §§ 17.41–17.63 (Vernon 1987 and Supp.1991), based upon alleged misrepresentations by Nick Griffin, former vice president of the Bank. Additionally, appellee sought a determination under the Uniform Declaratory Judgments Act as to the validity of the deed of trust relied upon by appellant. TEX.CIV.PRAC. & REM.CODE ANN. §§ 37.001–37.011 (Vernon 1986 and Supp.1991). Appellant defended on the ground that appellee was estopped to assert a homestead claim because appellee engaged in a conspiracy to

defraud appellant. Appellant also asserted counterclaims for fraud, judicial foreclosure, and the balance due on the renewal note dated February 7, 1986. The judgment signed on February 2, 1989 disposed of the claims as follows: (1) the Alvord property was found to be the homestead of appellee; (2) appellant's lien was declared void; (3) appellant was permanently enjoined from foreclosing on the void lien; (4) appellant recovered the balance due on the 1986 note from Vernon S. Bland and Gerda Bland (third-party defendants not a party to this appeal); and (5) all other claims were denied.

In February, 1979, appellee and Dan Davis purchased twelve acres of land outside Alvord, Texas. The property was listed in Dan Davis's name. In July of the same year, appellee moved his travel trailer onto the property, had a well dug, and got his electricity connected. Appellee sold his other property at the time he moved onto the Alvord property. In October of 1981, appellee began building a permanent home on the site. Appellee actually moved into the new home in June or July of 1982, prior to completion.

Appellee's son, Vernon S. Bland, moved to Texas in October of 1980. His spouse, Gerda Bland, followed in 1981. In November of 1981, they opened a travel agency in Fort Worth. Appellee began to see his son on a regular basis in 1984. At some point during the early months of 1984, the son and his wife approached appellee for money for their business.

Appellee testified that he went to a bank in Saginaw with his daughter-in-law, Gerda. Appellee went on to testify that during a meeting at the bank, it was suggested to him that he take out a loan against his house and pay off the debts of his son and daughter-in-law, so the bank would be able to work with the travel agency. Appellee testified that he refused to do so. Appellee also testified that he went to another bank with his son, but that there was no discussion of his home in Alvord.

Shortly after these trips to different banks, appellee's son contacted him and indicated he had found a banker who was willing to work with the travel agency, but the bank would require that appellee's home be put up as collateral. Appellee testified that he told his son he would not put up his house as collateral for any loan. Appellee also testified that he told his son that it would be okay if the banker came out and looked at the property.

Appellee testified that in 1982, the taxes on the property had been separated between Dan Davis and himself, so as to represent their respective shares. Appellee contacted the bank holding the note on the twelve acres to see if the bank would be amenable to partitioning the property, so that appellee would have title to four acres, including the lot on which appellee's house was situated. The bank agreed subject to appellee paying off the balance owed on the four acres. A survey was made of appellee's property on February 7, 1984. Appellee testified that he had planned to have the land partitioned and the survey done long before his son mentioned any financial problems. On March 6, 1984, appellee received a warranty deed from Dan Davis on the four acres. The warranty deed listed Vernon Bland as the owner of the four acres.

In March of 1984, Nick Griffin, a vice president of the Bank, came to the Alvord property to make an inspection. Appellee testified that he was present at the time Nick Griffin arrived. Appellee's son was also present during the inspection. Appellee took Griffin on a tour of the house which lasted about thirty minutes. Appellee also testified that at the time of the inspection, the house was ninety percent complete, and he was living in the house. Appellee further testified that he discussed his son's financial problems with Griffin and indicated that he wanted to help his son, but refused to use his house as collateral. Nick Griffin told appellee that this would not be a problem. Appellee testified that they reached an agreement whereby appellee would guarantee loans from the Bank to his son, on a monthly basis, for a period not to exceed one year. If at any time during this period, appellee's son did not meet his obligations, appellee was to be

notified so that he could come in and pay off the debt. According to appellee, this was the last time he saw Nick Griffin.

Appellee subsequently received a phone call telling him that some papers were ready. Appellee testified that he believed that these were papers required by the Bank so his son could begin to get the money as appellee and Griffin had discussed. At the title company, appellee signed a "Borrower's Statement," a "Real Estate Lien Note," a "Deed of Trust," and an "Affidavit as to Debts and Liens." These documents were signed on March 16, 1984. All of these documents listed appellee's four acres as the collateral for a $60,000 loan. The borrower on each document was listed as "Vernon Bland and wife Gerda Bland" or "Vernon Bland et ux Gerda Bland." The "Real Estate Lien Note" showed "Vernon Bland and wife, Gerda Bland" as the makers of the note and indicated that each maker was responsible for the entire amount of the note. There were signature lines for Vernon Bland and Gerda Bland at the bottom of the "Real Estate Lien Note" and the "Deed of Trust." Appellee testified that at the time he signed these documents, his was the only signature appearing. No one from the Bank was present when appellee signed the documents.

Appellee received no proceeds from the $60,000 loan. Subsequent to the loan, appellee was told by his son and daughter-in-law that all was going well with the travel agency. Then, in the early part of 1986, appellee was told that the business was having problems. In August, 1986, appellee was given a copy of a notice of foreclosure. The notice indicated that the foreclosure was to occur in two days. Appellee went to the Bank to see Nick Griffin. Appellee learned that Griffin was no longer associated with the Bank. Appellee was told by James Peek, another Bank officer, that appellee's son was three months behind on his loan payments. Appellee testified that he paid approximately $6,000 to stop the foreclosure action.

Appellee made five or six trips to the Bank to see the note paperwork. Appellee testified that the note he was shown was not one he had signed. Appellee then contacted an attorney who suggested appellee get copies of all relevant paperwork. Appellee made copies of documents at the courthouse and also got copies from the title company. One of these documents was a "Real Estate Lien Note" dated February 7, 1986. There was also a "Deed of Trust" dated February 7, 1986. Both of these documents were in the name of "Vernon Bland and wife, Gerda Bland." Appellee testified that he had not signed either of the two documents. Appellee's son, Vernon S. Bland, testified that he in fact signed the 1986 documents. The son also testified that he signed the documents at some location other than the title company. Gerda Bland, the son's wife, testified by deposition that she signed the 1986 documents at the title company and then took the documents to her husband so that he could sign them. James Peek testified that the 1986 note was a renewal and extension of the original 1984 note.

Appellee testified that he was never told that his son and daughter-in-law intended to renew the note in 1986. After discovering the new note, appellee obtained a deed covering the Alvord property from his son and daughter-in-law and recorded the deed. Appellee further testified that he got the deed in order to cloud the title issue, and not because he had ever given his son a deed to the property.

There was additional testimony offered to support appellee's claim that the property in question was his homestead. Charles Wooten, a friend of the appellee, testified that he had assisted appellee in building the house. He also testified that from 1979 until 1982, when the house construction began, appellee had lived in a trailer on the property. Finally, Charles Wooten testified that in March of 1984, one could readily tell someone lived in the house.

A stipulation was read into the record by appellee's counsel. This stipulation contained the testimony that would have been given if Leroy Morris, Tax Collector for the Alvord School District, had testified. The stipulation stated that appellee had claimed

a homestead exception on the land in question from 1982 until the time of the lawsuit.

A different story was told by appellee's son, Vernon S. Bland. The son testified that at the time these events occurred, he owned a home in Saginaw. The son testified that the $60,000 was borrowed for the express purpose of paying off the Saginaw bank debt, and not for financing of the travel agency. He further testified that appellee knew the purpose of the loan from the Bank.

The son testified that although he had never actually received a deed for the Alvord property, he thought appellee had given him the land. In fact, the son told other people that he owned the land. The son said that he based this belief on the fact that six or seven months before the 1984 loan from the Bank, appellee had offered to put up his house as collateral to help the son. The son further testified that appellee told Tom Stewart, president of the Lake Worth National Bank, that appellee would deed the land to the son because it would be his at some point anyway. The son testified that this proposal was rejected by Lake Worth National Bank because it would run afoul of the homestead laws.

The son went on to testify that he met Nick Griffin through an employee of the travel agency. He told Griffin that he had some property in Alvord that could be used as collateral for a loan from the Bank. The son did not tell Griffin that appellee owned the property in question. The son also told Griffin that his home was located in Saginaw and the Alvord property was used only as a vacation place. The son testified that at the time of the inspection, appellee was not living in the house. The son testified, however, that appellee was present when Nick Griffin visited the property. The son further testified that in March of 1984, the condition of the property was such that an observer would not be able to tell that anyone lived there.

The son testified that he showed up at the 1984 closing at the title company to sign the documents. The son testified that he was surprised when appellee signed the papers because the son believed that he was to be the one to sign. The son said that there was no conspiracy to defraud the Bank.

Finally, the son testified that prior to signing the 1986 note, he told appellee that there was going to be a new note. The son admitted that the signatures ("Vernon Bland") on the 1986 documents were his. The son went on to say that appellee had told him that appellee did not need to sign the 1986 note because the property belonged to the son.

Nick Griffin was also called to testify. In 1984, he was a senior vice president for the Bank. Griffin testified that he met appellee's son in the early part of 1984. At that time, the son offered the Alvord property as collateral for a loan from the Bank. The son represented that the property belonged to him and was used as a weekend place. Griffin testified that he asked the son about his homestead and was told that the son's homestead consisted of the property in Saginaw. Griffin further testified he never met appellee and was never told that appellee had any interest in the property.

Nick Griffin explained that as a part of the Bank's loan procedures, a survey, inspection, and appraisal of the property were required as well as insurance on said property. Griffin testified that he inspected the Alvord property on a Saturday morning. Upon arriving, he found appellee's son, the son's wife, and their two children. Griffin testified that the house appeared to be a typical weekend home that was about ninety to ninety-five percent complete. In addition, the condition of the property was consistent with the representations made by appellee's son. Griffin further stated that he did not believe the property was a homestead and he had relied upon the son's representations. Finally, Griffin testified he did not believe that he could have done any more to avoid being misled.

The foreclosure action and appellant's counterclaim for the balance due on the note were both based on the documents executed on February 7, 1986.

Before reaching appellant's first point of error, we believe a brief review of the law concerning homesteads, encumbrances, and estoppel is in order. Article XVI, section 50 of the Texas Constitution sets out the law relative to the encumbrances which can be assessed against the homestead:

The homestead of a family, or of a single adult person, shall be, and is hereby protected from forced sale, for the payment of all debts except for the purchase money thereof, or a part of such purchase money, the taxes due thereon, or for work and material used in constructing improvements thereon.... No mortgage, trust deed, or other lien on the homestead shall ever be valid, except for the purchase money therefor, or improvements made thereon, as hereinbefore provided, whether such mortgage, or trust deed, or other lien, shall have been created by the owner alone, or together with his or her spouse, in case the owner is married.

TEX.CONST. art. XVI, § 50.

■ Balanced against this constitutional provision which provides that unless the mortgage on the homestead is for the purchase money or for improvements it is invalid, are policy considerations which abhor the perpetration of fraud on creditors. These policy considerations have given rise to certain clauses and other protective measures. *See* Comment, *Intentions, Mortgages and the Homestead Exemption: A Matter of Estoppel,* 24 BAYLOR L.REV. 187, 188 (1972). Misrepresentations by a homestead claimant may, under the proper circumstances, create an estoppel to claim the homestead exemption. *See Lincoln v. Bennett,* 138 Tex. 56, 59, 156 S.W.2d 504, 505 (1941). A disclaimer of the homestead right is effectual when the circumstances are such that the claimant is estopped from asserting the homestead right. *See* 43 TEX.JUR.3d *Homesteads* § 133 (1985). A homestead claimant may not preclude himself from claiming the homestead exemption solely by the act of disclaiming property as his homestead, however. *See Englander Co. v. Kennedy,* 424 S.W.2d 305, 308 (Tex.Civ.App.—Dallas), *writ ref'd per curiam,* 428 S.W.2d 806 (Tex.1968).

■ Essentially, there are three different situations involving a homestead claimant's interest in land wherein the claimant might be estopped to claim the homestead exemption in light of declarations made to a mortgagee prior to, or contemporaneously with, the signing of a mortgage contract: (1) the claimant owns only one piece of property, and said property is being used as the claimant's homestead at the time of the mortgage; (2) the claimant owns more than one piece of property at the time of the mortgage, but only one parcel could be the homestead as a matter of law; and (3) the claimant owns more than one piece of property which has been used and occupied as a homestead prior to the time one of them is mortgaged. *See* Comment, *supra,* at 188–89.

■ The simplest situation exists where the claimant owns only one lot and at the time of the mortgage on the property for other than constitutionally delineated purposes, the claimant occupies and uses the lot for his home. Within the mortgage, the claimant will have declared that the mortgaged premises has not been in the past, nor is presently, used for homestead purposes. The question then becomes what effect, if any, will be given the homestead claimant's declaration, when at some future time the claimant defaults and the creditor seeks to foreclose on the premises? Under this fact situation, the courts have been unanimous in holding that the claimant is not estopped to set up the homestead exemption notwithstanding the declarations in the mortgage contract. *See Texas Land & Loan Co. v. Blalock,* 76 Tex. 85, 89, 13 S.W. 12, 13 (1890); *Ray v. Metzger,* 165 S.W.2d 207, 209 (Tex.Civ.App.—Fort Worth 1942), *aff'd,* 141 Tex. 372, 172 S.W.2d 480 (Tex.1943). This holding is based on the theory that the fact of actual possession and use of the property as a home is of so obvious a nature at the time of the mortgage that the lender cannot close his eyes to the facts. *See Blalock,* 13 S.W. at 13. When the facts of actual possession and use are coupled with the interest in the property held by the borrower, the premis-

es become a homestead in fact and in law. *See id.* A lender stands charged with notice of the fact of homestead and it matters not what declarations to the contrary the borrower might make. *Id.*

The second type of situation is where the claimant owns more than one piece of land, but only one of the lots, as a matter of law, could constitute the homestead at the time of the mortgage contract. It should be pointed out that when a court uses the language "the property constituted the claimant's homestead as a matter of law," the court is in effect saying that given all the facts and circumstances surrounding the use of the properties, such as suitability for occupancy, the court can come to no other conclusion but that only one of the properties could have been the homestead at the time of the mortgage. *See* Comment, *supra*, at 191–92. In this type of situation, the courts have held that the lender cannot shut his eyes to the fact that the mortgaged premises, which was being occupied at the time the deed of trust was executed, was the only property suitable for homestead purposes. *See Blalock*, 13 S.W. at 13; *see also City Central Bank & Trust Co. v. Byrne*, 47 S.W.2d 432, 434 (Tex.Civ.App.—San Antonio 1932, writ ref'd).

■ The situation that provides the most confusion, and the ripest ground for the application of estoppel principles, is the one where the claimant owns two or more pieces of property which may constitute the claimant's homestead at the time the claimant mortgages one of the parcels for some reason other than for purchase money or improvements thereon. Where the tangible facts respecting two pieces of property are such that the homestead character could attach to either, to the exclusion of the other, according to the intention of the claimant, a declaration by the claimant of his intention in this respect may estop the claimant from disputing the truth of the declaration. *See Hughes v. Wruble*, 131 Tex. 444, 448, 116 S.W.2d 368, 370 (1938).

Our research has also uncovered cases where, although owning only a single lot, the homestead claimant has been estopped to claim the exemption to stop a foreclosure action. One of these cases is *Alexander v. Wilson*, 124 Tex. 392, 77 S.W.2d 873 (1935). In this case, the Wilsons had lived on a rural tract of land for several years. In 1924, they moved into town to reside at a place owned by their son. In 1926, the Wilsons executed a note and secured the note by executing a mortgage on the rural land. The mortgage contained a recitation that the rural land was not the homestead of the borrowers. *Id.*, 77 S.W.2d at 874. When the lender sought to foreclose, the Wilsons claimed a homestead protection on the rural land. The court held that the Wilsons were estopped to assert their homestead claim. *Id.* In reaching this conclusion, the court pointed out that the visible circumstances at the time of the mortgage were consistent with the declaration of the borrower. The Wilsons had moved off the rural property and were living in town, which the court found consistent with an abandonment of the rural homestead. The court stated that the only indication of the homestead character of the property was the intention of the mortgagors. *Id.*

Other cases fitting this pattern have, like the *Alexander* case, involved situations where the claimants, at the time the representations concerning the subject property were made, were not occupying the premises as their homestead. *See, e.g., Miles Homes of Texas v. Brubaker*, 649 S.W.2d 791, 793 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.) (disclaimer made before premises used as homestead); *see also* 43 TEX. JUR.3d *Homesteads* § 136 (1985).

■ Thus, estoppel may arise where "ambiguous possession" exists. This principle is set out in the case of *Shearer v. Allied Live Oak Bank*, 758 S.W.2d 940 (Tex.App.—Corpus Christi 1988, writ denied):

It is the established rule of law in Texas that when the physical facts open to observation lead to a conclusion that the property in question is not the homestead of the mortgagor, and its use is not inconsistent with the representations made that the property is disclaimed as a

homestead, and these representations were intended to be and were actually relied upon by the lender, then the owner is estopped from asserting a homestead claim in derogation of the mortgage to secure the loan.

*Id.* at 945. [1]

■ We will now apply these principles of law to the case at hand. Appellant's first point of error contends that the trial court erred by giving an incorrect instruction to the jury on deemed knowledge by a lender of homestead status. Appellant complains that said instruction ignored the law of ambiguous possession and denied appellant a fair submission of its estoppel defense.

The first jury question asked the jury to determine whether the Alvord property was the homestead of appellee on or about March 15, 1984. In connection with this question, the trial court provided the following instruction:

> When a homestead claimant is in actual occupancy of his homestead, it will be deemed that a lender or encumbrancer acted with knowledge of the occupant's right to invoke the rule of homestead.

Appellant believes that this instruction was incorrect, incomplete, and prejudicial to appellant's estoppel defense. Appellant objected to the instruction and tendered its own requested instruction, which was denied. Appellant's requested instruction read:

> You are instructed that when a homestead claimant is in open and obvious occupancy of property as a home and the physical facts are not such as to warrant a reasonable conclusion by a lender that the property is not homestead, then it will be deemed that a lender acted with knowledge of the occupant's right to invoke the rule of homestead.

The instruction appellant complains of is a correct statement of the law. *See Englander Co.,* 424 S.W.2d at 309; *Byrne,* 47

S.W.2d at 434; *see also* 43 TEX.JUR.3d *Homesteads* § 134 (1985).

At trial, appellant relied upon estoppel as a defense. Appellant contended that the estoppel was founded on appellee's declaration in the "Deed of Trust" dated March 16, 1984. The deed contained a clause wherein the signatories disclaimed any homestead interest in the referenced property. In addition, appellant contended that the use of the property in question was not inconsistent with the representations made to the Bank by Vernon S. Bland. In essence, appellant is arguing that because of ambiguous possession, appellee is estopped to claim the homestead exemption.

Not only does appellant complain of the instruction previously set out, but also complains that the trial court should have submitted two questions appellant claims would have allowed the jury to pass on appellant's ambiguous possession theory. Appellant requested the following jury questions, which were refused:

> Do you find from a preponderance of the evidence that Mr. Griffin inspected the Alvord property prior to making the loan in question and that the appearance of the Alvord property upon inspection by Mr. Griffin was consistent with the representations made to him that it was the weekend place of Vernon S. Bland?

> Do you find from a preponderance of the evidence that Mr. Griffin knew on or before March 16, 1984, that the Alvord property was claimed by the Plaintiff as his home?

■ As previously discussed in our analysis of the law concerning homestead and estoppel, case law provides that a homestead claimant may be estopped to claim the homestead exemption where physical facts open to observation lead to a conclusion that the property in question is not the homestead, the use of the property is not inconsistent with the claimant's representations that the property is disclaimed as the homestead, and the representations

---

**1.** This principle has been applied in a number of cases. *See, e.g., Hughes,* 116 S.W.2d 368; *Shearer,* 758 S.W.2d 940; *Prince v. North State Bank,* 484 S.W.2d 405 (Tex.Civ.App.—Amarillo 1972, writ ref'd n.r.e.); *Greer v. Franklin Life Ins. Co.,* 109 S.W.2d 305 (Tex.Civ.App.—Dallas 1937, writ dism'd by agr.) (opinion on reh'g).

were intended to be and were actually relied upon by the lender. *See Shearer*, 758 S.W.2d at 945.

■ Appellee, plaintiff below, had the initial burden of establishing the homestead character of the subject property. *See Lifemark Corp. v. Merritt*, 655 S.W.2d 310, 314 (Tex.App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.). In order to establish that the property was appellee's homestead, the proof must show a combination of overt acts of homestead usage and the intention on the part of the owner to claim the land as homestead. *Id.; Sims v. Beeson*, 545 S.W.2d 262, 263 (Tex.Civ.App.—Tyler 1976, writ ref'd n.r.e.). Actual use of the land is the best evidence of intention. *Lifemark*, 655 S.W.2d at 315. Possession and use of land by one who owns it and who resides upon it makes it the homestead in law and in fact. *Id.* at 314; *Garrard v. Henderson*, 209 S.W.2d 225, 230 (Tex.Civ. App.—Dallas 1948, no writ).

Appellee testified that he purchased the subject property in February, 1979, and moved to the property in July of 1979. In October of 1981, appellee began to build a permanent house on the land. In the summer of 1982, appellee moved from his trailer into the new house. Appellee has continued to live on the property since that time.

Charles Wooten, a friend of appellee, testified that he assisted appellee in the construction of the house. He also testified that appellee had been living on the property since 1979. There was also a stipulation entered into the record that appellee had claimed a homestead exception on the land from 1982 until the time of the lawsuit. Finally, Dan Davis, another witness called by appellee, testified that appellee had lived on the premises since August 1980.

Given the evidence found in the record, we find that appellee met his burden of establishing the homestead character of the premises as a matter of law. *See Lifemark*, 655 S.W.2d at 314–15; *Sims*, 545 S.W.2d at 263. Even if the controverting evidence was sufficient to make this a question of fact, the jury found that the Alvord property was the appellee's homestead at the time the deed of trust was signed.

■ Appellant's reliance on the principle of estoppel is misguided. Appellant places a great deal of emphasis on the following facts: (1) Vernon S. Bland, appellee's son, made representations concerning the Alvord property; (2) Nick Griffin was told by the son that his homestead was in Saginaw and a review of deed records and a drive by the residence confirmed this statement; (3) a thirty-minute inspection of the Alvord property by Nick Griffin showed circumstances consistent with the son's representations that said property was his vacation home; and (4) there was a disclaimer of homestead status contained in the deed of trust. If the facts of this case were such that appellee's son, Vernon S. Bland, was in fact the owner of both lots, the Alvord and Saginaw property, we could understand appellant's reliance on the doctrine of estoppel and ambiguous possession. If that were the case, then the fact that the Saginaw property was in fact the homestead of the son and his wife, combined with the representations made and a disclaimer contained in the deed of trust given to secure the loan, would make those cases dealing with the situations in which a homestead claimant may lose his right to claim the homestead exemption applicable. *See, e.g., Hughes*, 116 S.W.2d 368; *Shearer*, 758 S.W.2d 940. This is not the case, however.

The facts of this case do not support the application of the estoppel principle. In the case at hand, appellee was the record owner of the property in question. Appellee owned no other land. Appellee had a warranty deed for the Alvord property. Appellee had built a house on the property and lived there since 1982. Appellee had been claiming a homestead exception on the property for tax purposes since 1982. In addition, the loan in this case was not made to appellee, but was made to appellee's son and the son's spouse. Finally, the only representation that could conceivably be credited to appellee concerning the property is the homestead disclaimer contained in a deed of trust that should never have been

signed by appellee in the first place as he was not the person to whom the money was being loaned. Since the record indicates that appellee was occupying and using the premises as his homestead, any declaration, even if chargeable against appellee, did not estop appellee from claiming the homestead exemption. *See Blalock*, 13 S.W. at 13; *Metzger*, 165 S.W.2d at 209.

The facts of this case also do not support application of the cases represented by *Alexander*, 77 S.W.2d 873. As we have previously discussed, this line of cases employs the estoppel principle where the homestead claimant made representations and a disclaimer of homestead status at a time when the claimant was not occupying the premises as a homestead. The record in this case contains the testimony of several witnesses, including appellee, whose testimony concerned appellee's occupation of the premises in question.

Finally, we note the jury found that: (1) the property was in fact appellee's homestead; (2) appellee should not be estopped to claim the homestead exemption; and (3) appellee did not commit fraud against appellant.

Since the doctrines of estoppel and ambiguous possession are not applicable to the case at hand and the instruction complained of is a correct statement of the law, we find that the trial court did not err in so instructing the jury.

Appellant's first point of error is overruled.

■ Appellant's second point of error contends that the trial court erred by: (1) instructing the jury that estoppel cannot arise based solely on declarations of the homestead claimant; and (2) by failing to submit an ambiguous possession question in connection with appellant's estoppel defense. In connection with a question which asked the jury whether appellee should be estopped to claim the Alvord property as his homestead, to which the jury answered no, the trial court instructed the jury that:

No estoppel can arise in favor of a lender or encumbrancer who has attempted to secure a lien on homestead property which is in actual use and possession of the homestead claimant, based solely on declarations, whether written or oral which state to the contrary.

Appellant complains that this instruction is incomplete, incorrect, misleading, and constitutes a comment on the evidence. Appellant contends that by instructing the jury in this manner, appellant was denied a fair submission of its estoppel defense.

The instruction complained of is a correct statement of the law. *Lincoln*, 156 S.W.2d at 506; *Blalock*, 13 S.W. at 13. As we have already pointed out in our discussion under the first point of error, the principles of estoppel and ambiguous possession are not relevant to the facts of the case at hand.

Given our analysis under the first point of error, and the fact that the instruction set out above is a correct statement of the law, we find that the trial court did not err in so instructing the jury.

Appellant's second point of error is overruled.

■ Appellant's third point of error contends that the trial court erred in admitting twenty-nine photographs into evidence over appellant's objection that appellee had failed to supplement a discovery request to include these items. We are told by appellant that pursuant to a written notice of oral deposition, appellee was presented with a subpoena duces tecum requesting production of all documents, including photographs, that tended to prove appellee's claim that the Alvord property was appellee's homestead in March, 1984. Unfortunately, appellant did not ensure that said document was presented for review by this court. We will, however, go ahead and address this point of error.

The Texas Rules of Civil Procedure provide that under certain circumstances a party is under a duty to supplement a response to discovery request. The rules provide that:

A party who has responded to a request for discovery that was correct and complete when made is under no duty to supplement his response to include infor-

mation thereafter acquired, except the following shall be supplemented not less than thirty days prior to the beginning of trial unless the court finds that a good cause exists for permitting or requiring later supplementation.

a. A party is under a duty to reasonably supplement his response if he obtains information upon the basis of which:

. . . .

(2) he knows that the response though correct and complete when made is no longer true and complete and the circumstances are such that failure to amend the answer is in substance misleading. . . .

TEX.R.CIV.P. 166b(6). Furthermore, rule 215 provides that:

A party who fails to respond to or supplement his response to a request for discovery shall not be entitled to present evidence which the party was under a duty to provide in a response or supplemental response or to offer the testimony of an expert witness or of any other person having knowledge of discoverable matter, unless the trial court finds that good cause sufficient to require admission exists. The burden of establishing good cause is upon the party offering the evidence and good cause must be shown in the record.

TEX.R.CIV.P. 215(5).

▉▉▉▉ The failure of a party to supplement his response to a discovery request, where applicable, results in the automatic exclusion of the evidence. *Morrow v. H.E.B., Inc.,* 714 S.W.2d 297, 297 (Tex. 1986) (per curiam opinion on reh'g); *Southland Corp. v. Burnett,* 790 S.W.2d 828, 829 (Tex.App.—El Paso 1990, no writ). There is an exception to this strict rule, however. This exception exists when the party proffering such evidence is able to establish before the trial court good cause for allowing the evidence. *Boothe v. Hausler,* 766 S.W.2d 788, 789 (Tex.1989) (per curiam); *see Morrow,* 714 S.W.2d at 298. The determination of good cause is within the sound discretion of the trial court. *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396

(Tex.1989); *Morrow,* 714 S.W.2d at 298. A determination of good cause can only be set aside if the trial court's discretion was abused. *Smithson v. Cessna Aircraft Co.,* 665 S.W.2d 439, 442 (Tex.1984). To determine if there has been an abuse of discretion, we must look to see if the trial court acted without reference to any guiding principles and rules. *Morrow,* 714 S.W.2d at 298; *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). In other words, the test is whether the trial court's action was so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985, orig. proceeding).

To show good cause for failure to supplement appellee's discovery response at least thirty days before the start of trial, appellee's counsel established that the photographs were not taken until the Saturday just before the trial started. Appellee's counsel also stated that the photographs had not become available until the day appellee sought to have them introduced because appellee was waiting for the photographs to be developed. Appellee also points out that the trial court offered to allow appellant additional time to review the photographs before the trial court admitted them into evidence.

We cannot find that the trial court necessarily abused its discretion in finding that good cause existed for allowing the photographs to be introduced into evidence.

Appellant's third point of error is overruled.

▉▉▉▉ Appellant's fourth point of error complains that the trial court erred by permitting appellee's counsel to comment on the failure of appellant to call a witness to testify. During appellee's closing statement, counsel for appellee stated: "They talk about how—how this title closing is so important. Did the Defendant call Carolyn Williams up here to dispute. . . ." Appellant objected to this statement. The trial court stated:

THE COURT: I'll overrule the objection, but the jury will remember that the only evidence that they'll consider is what they have heard from the witness stand—the testimony and the material that's been admitted and the reasonable *references* [probably meant to say inferences].

But you'll only consider what you heard from the witness stand.

■■■■■ Comment on the failure to produce a witness in a civil case is generally improper where the witness is equally available to both parties. *Grogan v. Santos*, 617 S.W.2d 312, 316 (Tex.Civ.App.—Tyler 1981, no writ); *Sanders v. St. Paul Fire & Marine Ins. Co.*, 429 S.W.2d 516, 521 (Tex.Civ.App.—Texarkana 1968, writ ref'd n.r.e.). Counsel may comment on the failure of the opposing party to call a witness employed by said party. *Tex–Jersey Oil Corp. v. Beck*, 157 Tex. 541, 548, 305 S.W.2d 162, 167 (1957), *overruled on other grounds, Sanchez v. Schindler*, 651 S.W.2d 249 (Tex.1983). "The right to comment on the failure to call and use an employee-witness does not grow out of the unavailability of the witness but out of his relationship with the opposite party." *Id.*, 305 S.W.2d at 167. The right to comment on the failure to call a witness arises when the witness has some relationship to the opposing party so as to cause said witness to tend to favor the opposing party, or to place the opposing party in a better position to obtain material information on the point at issue from the witness. *See Brazos Graphics, Inc. v. Arvin Indus.*, 574 S.W.2d 240, 244 (Tex.Civ.App.—Waco 1978), *writ ref'd per curiam*, 586 S.W.2d 841 (Tex.1979); *Sanders*, 429 S.W.2d at 522.

Appellee urges this court to find that no error was committed in commenting on the failure to call Carolyn Williams, an escrow agent for the title company where appellee signed the deed of trust and other documents, because said witness is so closely aligned with appellant. Appellee points to the following facts: (1) appellant chose the title company; (2) appellant provided a complete list of detailed instructions on how to conduct the closing; and (3) appellant reviewed the documents received from the title company. We do not believe this witness stood in any sort of special relationship to appellant that would predispose the witness to favor appellant over appellee or would place appellant in a better position to obtain material information. *See Brazos Graphics*, 574 S.W.2d at 244; *Sanders*, 429 S.W.2d at 523.

■■■■■ Pursuant to the preceding analysis, the trial court should have sustained appellant's objection to appellee's comment during closing argument. Although it was error for the trial court to fail to sustain appellant's objection, we must now determine whether such error requires reversal. Only when the error "was reasonably calculated to cause and probably did cause rendition of an improper judgment" is a cause to be reversed. TEX.R.APP.P. 81(b). Because of the instruction to the jury to consider only the evidence properly before the jury, we find the error to be harmless.

Appellant's fourth point of error is overruled.

■■■■■ Appellant's fifth, and final, point of error complains that the trial court erred in submitting questions concerning alleged DTPA violations to the jury, thus improperly prejudicing the position of appellant. Jury Questions Nos. 3, 4, and 5 concerned alleged violations of the Deceptive Trade Practices—Consumer Protection Act ("DTPA").

■■■■■ As appellant correctly points out, in order to bring a cause of action under the DTPA, the plaintiff must be a "consumer" as defined in the Act. *Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 173 (Tex. 1980). In the case at hand, appellee was seeking a line of credit for his son's travel agency. Money is not a good. *Id.* at 174. One who seeks only money in a transaction does not meet the definition of a consumer, there being a clear legislative intent that the extension of credit was not to be covered. *Id.* at 175; *Smith v. United States Nat'l Bank*, 767 S.W.2d 820, 824 (Tex.App. —Texarkana 1989, writ denied).

Although appellant has shown this court that error was committed, appellant has made no showing that submission of the issues amounted to such a denial of rights as was reasonably calculated to cause and probably did cause rendition of an improper judgment. TEX.R.APP.P. 81(b). In response to Jury Question No. 5, which asked the jury to find what sum of money would compensate appellee for his damages resulting from the DTPA violations, the jury answered "$0" damages. The judgment did not include any damages reflecting an award for DTPA violations. Any error in submitting the issues to the jury was, therefore, harmless. *See Geotech Energy Corp. v. Gulf States,* 788 S.W.2d 386, 392 (Tex.App.—Houston [14th Dist.] 1990, no writ).

Appellant's fifth point of error is overruled.

The judgment of the trial court is affirmed.