**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff,**

v.

**Hugh MUNN, Defendant.**

**Hugh MUNN,
Plaintiff-Appellee-Appellant,**

v.

**SOUTHWEST BANK OF SAN ANGELO,
Defendant-Appellant,**

**and**

**E. Ray Jones and William Golden,
Defendants-Appellees.**

No. 85–1178.

United States Court of Appeals,
Fifth Circuit.

Nov. 25, 1986.

Opinion on Rehearing Jan. 12, 1987.

Rod Phelan, Dallas, Tex., Shannon, Porter, Johnson, Sutton & Greendyke, Craig Porter, William Greendyke, San Angelo, Tex., Hughes & Luce, M. David Bryant, Jr., David C. Godbey, Dallas, Tex., for Southwest Bank.

James V. Hammett, Jr., Stubbeman, McRae, Laughlin & Browder, Inc., Deborah Essig Taylor, Houston, Tex., for Munn.

Larry Daves, Daves, McCabe & Hahn, Tyler, Tex., for Golden.

Ralph Dreyer, San Angelo, Tex., for Jones.

Mitzi Turner, El Paso, Tex. (other interested party), for FDIC.

Before GEE, GARZA, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

We are asked to decide whether the guarantor of a loan to finance the purchase of stock in a corporation indebted to the lender is a "consumer" of bank services under the Texas Deceptive Trade Practices Act. We conclude that the district court erred in not submitting to the jury the question whether the alleged services purchased were objectives of the plaintiff's transaction. We also hold that the jury's answers to the special verdict were so contradictory that a new trial is required.

I

A

Trans-Intercontinental Drilling Corporation (TIDCO) was one of many companies involved in the West Texas oil boom at the beginning of this decade. During 1981 TIDCO's financial condition worsened, and two of TIDCO's principal shareholders, E. Ray Jones and Charles W. Harle, decided to restructure TIDCO's finances. Jones and Harle sought capital to buy out two of the company's shareholders, Poyner and Kelly, and to refinance TIDCO's debt, part of which was held by the defendant, Southwest Bank of San Angelo.

About that time, plaintiff Hugh Munn became interested in acquiring TIDCO stock. In early July 1981, Munn met with Jones, Harle, and their accountant, William Golden, to discuss the financial reorganization of TIDCO. At that meeting, Munn offered to buy Poyner's and Kelly's stock for $60,000.00.

Before Munn could buy the stock, however, Jones and Harle negotiated a "settlement agreement" with Poyner and Kelly, under which Jones and Harle would themselves purchase the stock. The agreement was contingent upon Southwest Bank's granting a new loan to TIDCO. The agreement also provided for Southwest Bank to hold the Poyner and Kelly stock, disburse loan funds in a certain manner, and secure the release of certain liens and liabilities. Because the $1.6 million loan exceeded

Southwest Bank's lending limits, the bank sought the participation of First National Bank of Midland. First National was reluctant to participate unless additional, financially sound parties were involved.

After the settlement agreement was arranged, Golden organized a meeting at Southwest Bank on July 27, 1981, with Munn, Jones, Harle, and Southwest's president, David Drake. Golden informed Munn before the meeting that Jones and Harle had already acquired the stock. Although Munn testified that he thought this meant that he was no longer needed, Golden nonetheless convinced him to attend the meeting.

At the meeting, Munn signed a guaranty for all of TIDCO's indebtedness to Southwest Bank. The parties disputed at trial the other events of the meeting. Munn admitted that he did not read the guaranty document, but testified that he thought he was co-signing a $1.4 million "note" rather than a guaranty. Munn believed that by signing the document he would be able to control fifty percent of the TIDCO stock. Munn also said that, when he questioned the ability of Jones and Harle to handle the pending loan, Drake expressed confidence in Jones and Harle, Drake told him that the bank would supervise TIDCO's credit, and Drake assured him that his credit would not be "abused."

Southwest Bank contends that Drake understood the meeting as simply a closing for a deal that the other parties had already arranged. Moreover, Drake testified that he did not recall promising to do anything for Munn.

In any event, the loan was made and the company was reorganized. But within eight months of the meeting, TIDCO collapsed in involuntary bankruptcy, and this dispute ensued.

B

Southwest Bank sued Munn to recover on the guaranty the approximately $2.8 million TIDCO owed the bank, and Munn sued seeking rescission of the guaranty agreement, both in state court. First National Bank of Midland intervened in Southwest Bank's suit against Munn to protect its participation interest in the loans to TIDCO. Later, First National Bank of Midland became insolvent and the Federal Deposit Insurance Corporation, as receiver, replaced it in the suit. The FDIC also intervened in Munn's suit against Southwest Bank and removed both cases to the United States District Court for the Northern District of Texas, basing federal jurisdiction on 12 U.S.C. § 1819. Both cases were transferred to the Western District of Texas and consolidated for trial. The trial judge realigned the parties, designating Munn as the plaintiff and Southwest Bank, the FDIC, Jones, and Golden as defendants. Munn had also sued Harle, but the action was dismissed because Harle had already been adjudicated a bankrupt.

Munn sued the various defendants on a number of grounds: common law fraud; conspiracy; breach of fiduciary duties; securities law violations; failure of the creditor to disclose information to a surety; and deceptive trade practices under the Texas Deceptive Trade Practices-Consumer Protection Act (DTPA), Tex.Bus. & Comm. Code Ann. §§ 17.41–17.63 (Vernon Supp. 1986).

After the issues were narrowed and a trial was held, Southwest Bank requested a jury instruction that, for Munn to be a consumer under the DTPA, the jury must find "the existence of an agreement ... that Southwest Bank would render services to Hugh Munn individually and in addition to the actual extension of credit to TIDCO and/or Hugh Munn." The judge denied the request, effectively ruling as a matter of law that Munn was a DTPA consumer.

The jury returned with special verdicts absolving Southwest Bank of fraud and conspiracy, but finding that Southwest Bank violated the DTPA by (1) knowingly employing false, misleading, or deceptive acts in dealing with Munn, and (2) *un*knowingly acting "unconscionably" toward Munn. The jury specified $700,000.00 in damages for the knowing violation of the

DTPA and nothing for the unknowing unconscionability. The jury also found Golden and Jones guilty of fraud and conspiracy for inducing Munn to sign the guaranty, and awarded $1,580,000.00 in damages against the two. In addition, the jury concluded that Munn had suffered $265,000.00 in damages as a result of Jones' material misrepresentation in offering TIDCO stock for sale. Finally, the jury awarded $388,300.00 in punitive damages against unspecified defendants. The district judge, however, noting that no evidence of damages had been presented at trial, confined the remedy to rescission of the guaranty and awarded attorneys' fees against Southwest Bank.

Southwest Bank appeals the judgment against it, while Munn appeals the court's failure to award damages against Golden and Jones.

## II

Southwest Bank argues that Munn cannot recover under the DTPA because he is not a "consumer," which is a statutory prerequisite to his stating a DTPA claim. *See Riverside National Bank v. Lewis*, 603 S.W.2d 169, 173 (Tex.1980). Southwest Bank also argues that a dispute over a fact material to DTPA consumer status—whether an agreement existed for services collateral to the extension of credit—should have been submitted to the jury instead of being decided by the judge.

Ordinarily, the plaintiff's status as a consumer is a question of law for the trial court to determine from the evidence. *Ridco, Inc. v. Sexton*, 623 S.W.2d 792, 795 (Tex.Civ.App.—Fort Worth 1981, no writ). However, "if some of the basic ingredients of the question of consumer [status] are in dispute, those questions should be submitted to the jury." *Id.* Thus, if the existence of an agreement for services collateral to a credit extension is a "basic ingredient" of DTPA consumer status, the question should have been submitted to the jury.

The DTPA defines "consumer" as one "who seeks or acquires by purchase or lease, any goods or services." Tex.Bus. & Comm.Code Ann. § 17.45(4). In addition, a person is a "consumer" only if the purchased goods or services form the basis of his complaint. *See Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 539 (Tex. 1981).

"Goods" has a fairly certain meaning under Texas law. The DTPA defines "goods" as "tangible chattels or real property purchased or leased for use." Tex. Bus. & Comm.Code Ann. § 17.45(1). "Goods" does not include intangible chattels such as stocks, *see Portland Savings & Loan Association v. Bevill, Bresler & Schulman Government Securities, Inc.*, 619 S.W.2d 241, 245 (Tex.Civ.App.—Corpus Christi 1981, no writ), money, *see Riverside*, 603 S.W.2d at 174, or loans, *id.* Since the TIDCO stock and the bank loan are not goods, Munn must establish that he purchased "services" to qualify as a consumer.

"Services" has a less certain meaning under Texas law. The DTPA defines "services" as "work, labor or service purchased or leased for use, including services furnished in connection with the sale or repair of goods." Tex.Bus & Comm.Code Ann. § 17.45(2). "Services" does not include intangible chattels such as stocks, *Portland Savings*, 619 S.W.2d at 245, or loans, *Riverside*, 603 S.W.2d at 174-75. The plain language of the statute indicates that labor, work or service that is the sole purpose of a contract is a "service" within the DTPA. In addition, when a service is furnished in connection with the sale of a "good," it is a "service" under the DTPA. The specific statutory reference to services furnished in connection with the sale of a "good" and the corresponding omission of reference to services in connection with the sale of something that is not a "good," however, suggest that a service furnished in connection with the sale of intangibles is not a "service" under the DTPA.

On the other hand, all transactions involve human service to some extent, the cost of which is included in the price of the transaction. Arguably, then, all services in

any transaction are purchased "services" under the DTPA. Under this approach, any service involved in a stock purchase or loan transaction would give rise to DTPA consumer status even though the actual stock purchase or loan could not, thereby undermining the legislature's exclusion of sales of intangible chattels from the DTPA. Thus, it appears that at least some activities related to the sale of intangibles must not be "services" under the DTPA.

The Texas courts, in DTPA cases involving intangibles, have struggled to distinguish purchased services from activities not covered by the DTPA. In *Riverside National Bank v. Lewis,* 603 S.W.2d 169 (Tex.1980), the Texas Supreme Court held that an extension of credit did not constitute "goods" or "services" under the DTPA. In denying consumer status to Lewis, who alleged that his car was repossessed when the bank failed to lend him money after telling him it would, the court stated:

> It has also been argued that in the course of extending credit [which is not covered by the DTPA], Riverside Bank necessarily provided other services to Lewis. These services could have included such things as help in filling out his loan application, financial counseling, and the processing of his loan. It has been contended that these activities constituted "services" as defined by the DTPA, and thus made Lewis a "consumer" who could maintain a private cause of action under section 17.50. We disagree.

> The evidence in this case establishes that Lewis approached Riverside Bank with one objective; he sought to acquire money. He attempted to obtain this money by promising to repay the indebtedness in the future, with interest. Put simply, he sought to exchange future amounts of money for that amount which he desired to have in the present. There is no evidence that he sought to acquire anything other than this use of money.

603 S.W.2d at 175. The court added a footnote saying:

> [W]e do not pass upon the question whether a bank's misrepresentation concerning its activities, such as the availability of financial counseling, the cost of processing a loan or the ability to pay a customer's monthly bills, could constitute a deceptive act in connection with a sale of "services." We only hold that where those activities are not the subject of the complaint, then the presence of such collateral activities in a transaction otherwise not covered by the DTPA does not subject the parties to liability under the DTPA.

*Id.* at 175 n. 5. The court thus held that the extension of credit did not confer consumer status, but left open the question whether activities collateral to a loan transaction can be services under the DTPA.

The Texas courts have generally confined *Riverside*'s denial of consumer status to cases in which the loan is the sole basis of the complaint and was the plaintiff's central objective. *See, e.g., Flenniken v. Longview Bank & Trust Co.,* 661 S.W.2d 705 (Tex.1983); *First Federal Savings & Loan Association v. Ritenour,* 704 S.W.2d 895 (Tex.App.—Corpus Christi 1986); *see also Knight v. International Harvester Credit Corp.,* 627 S.W.2d 382 (Tex.1982).

In *Flenniken,* for example, the plaintiffs exchanged a mechanic's lien secured by a deed of trust for the construction of a residence. The builder assigned the lien to the defendant bank in return for interim construction financing, but later abandoned the contract after completing only 20% of the work. The bank then foreclosed on the property. The court ruled that the plaintiffs were DTPA consumers because the home purchase was the borrower's central objective: "[T]he Flennikens make no complaint as to the Bank's lending activities. Unlike Lewis [the plaintiff in *Riverside* ], the Flennikens did not seek to borrow money; they sought to acquire a house. The house thus forms the basis of their complaint." 661 S.W.2d at 708. Thus, the court reaffirmed the ruling in *Riverside* that a loan by itself is not a purchase of goods or services, but permitted the claim

because the mortgagor's activities were connected with the purchase of a good, the home.

Likewise, in *Ritenour*, the plaintiff sought to prevent his wife from withdrawing funds from a certificate of deposit that they held in joint tenancy. The bank informed Ritenour that he could place a "hold" on the account, which would require both parties' signatures to authorize a withdrawal. The bank failed to honor the hold, and Mrs. Ritenour depleted the account. Even though the certificate of deposit was neither a good nor a service under the DTPA, *see First State Bank v. Chesshir*, 613 S.W.2d 61, 62–63 (Tex.Civ. App.—Amarillo 1981), *rev'd on other grounds*, 620 S.W.2d 101 (Tex.1981), the court upheld Ritenour's DTPA claim, stating: "[Mr. Ritenour] purchased financial counseling services, collateral to the certificate of deposit, from First Federal at the time the certificate of deposit was acquired." 704 S.W.2d at 900.

*Riverside, Flenniken,* and *Ritenour* represent three categories of cases involving intangibles, from which emerges the key principle to determining consumer status under the DTPA: the purchased goods or services must be an objective of the transaction, not merely incidental to it. *Flenniken* represents the category of cases in which a loan is connected to the purchase of a good, which is the objective of the transaction, and thus the court finds as a matter of law that the plaintiff falls squarely within the definition of "consumer" as one "who seeks or acquires by purchase ... any goods." *See also Knight v. International Harvester Credit Corp.*, 627 S.W.2d 382 (Tex.1982).

*Riverside* and *Ritenour*, however, reflect the tension in the statute when the objective of the transaction is the exchange of intangibles. *Riverside* represents the category of cases in which the court denies consumer status because the transaction's sole objective is the exchange of intangibles (present money for future money or money for stocks) and because the complaint's basis is the purchase of the intangible instead of any collateral services. *Ritenour* represents the category of cases in which the court grants consumer status even though an important objective is the purchase of an intangible, for the service that forms the basis of the complaint is *also* an important objective of the transaction and hence is a purchased "service."

Unfortunately, *Ritenour* does not clearly identify when an activity is an objective of a transaction that also involves an intangible and when the activity is merely incidental to the central objective of acquiring the intangible. *Ritenour* does reject the plain language position that *no* activity in connection with the sale of an intangible can be a "service" under the DTPA. However, it does not undermine the exclusion of sales of intangibles from the DTPA by holding that *all* activities in connection with the sale of intangibles are "services."

Mr. Ritenour established that the bank's financial counseling and the "hold" on his account were central to the transaction by showing that he considered them important enough to seek them separately from the purchase of the certificate of deposit; by showing that he undertook an important course of action, the protection of his money, based on the service alone; and by showing that the bank offered him the service specially and financed it through revenues from its accounts. Consequently, when a transaction's central objective is the acquisition of an intangible, Texas law requires a plaintiff to produce uncontroverted evidence similar to that produced in *Ritenour* in order to establish as a matter of law that a collateral service was an objective of the transaction and not merely incidental to the performance of a transaction excluded under the DTPA.

When the evidence is controverted, as in the case before us, the question is one of fact and must be submitted to the jury.[1] We believe Texas courts would see that this rule prevents the undermining of *Riverside* and preserves the statutory exclusion of purchases of intangibles, while serving the legislative purpose of protecting consumers from deceptive trade practices.

Munn contends that he purchased five "services" from Southwest Bank by signing the guaranty agreement: (1) a recom-

1. We expect that in most cases, the facts will be sufficiently clear that a judge can rule as a matter of law on DTPA consumer status. In *Ritenour,* the appellant apparently did not raise the issue of who should properly decide whether the financial services and counseling were objectives of the transaction.

mendation about the abilities of Jones and Harle; (2) a recommendation about the financial worth of TIDCO, Jones, and Harle; (3) disbursement of loan proceeds under the "settlement agreement"; (4) escrow or depository services; and (5) supervision of TIDCO's credit and protection of Munn's credit.

■ The district court did not base Munn's DTPA consumer status on either of the first two alleged services. The record indicates that Munn's evidence was insufficient to establish that the objectives of the transaction included the bank's assessment of the abilities and financial worth of Jones, Harle, and TIDCO. At best, Munn established a misrepresentation not connected to a DTPA service. Thus, the district court was correct in not basing consumer status on these services, as well as in not submitting questions about them to the jury.

The district court based Munn's consumer status on the last three alleged services, which the court recognized were intertwined. A bank's escrow and disbursement activities are an integral part of a loan transaction, and thus normally should not give rise to DTPA consumer status. Munn, however, presented evidence sufficient to allow a jury to decide that the services were objectives of his transaction with the defendants. The settlement agreement itself and various witnesses indicated that Southwest Bank assumed unusual duties with regard to the stock in escrow and the disbursement of loan funds: the bank was to hold the stock in escrow, use loan funds to pay the liens and liabilities necessary to release the stock from escrow, and disburse loan funds in the manner most beneficial to TIDCO's continued operation. There was evidence that, in connection with these services, the bank promised to supervise TIDCO's credit. There was also evidence that Drake knew Munn could not receive TIDCO stock unless the bank released the stock.

■ Nevertheless, this evidence was controverted. Drake denied receiving the stock subject to the settlement agreement. Witnesses differed about whether the bank was to supervise TIDCO's credit and protect Munn's credit, as well as about whether Munn sought that service. This conflicting testimony should have prevented the district court from determining as a matter of law that these "services" were objec-

tives of the transaction. The court should have asked the jury to determine the issue.

The district court did ask the jury one question about the agreement between Munn and the Bank:

5(A) Do you find that Southwest Bank's and Munn's agreement whereby Munn was to guarantee the debt of TIDCO, included the term that Southwest Bank would deliver the TIDCO shares of stock owned by Poyner and Kelly to Jones and Harle, that such was a material term, and that Southwest Bank failed to make such delivery?

Unfortunately, the inquiry is confined to the delivery of the TIDCO shares. Moreover, as the district court explained in its jury instructions, the question responded to the parties' contentions regarding contract formation: whether the guaranty included the escrow service in its specific terms, whether the guaranty failed for want of consideration, or whether the guaranty failed for nonperformance of a condition precedent. This interrogatory did not adequately inquire into the objectives of the transaction.

### III

We next consider whether other aspects of the case should be remanded for a new trial because of their close connection to the DTPA claims and because of the conflicts in the special verdict. The special verdict is a useful device for clarifying a jury's verdict and for focusing the jurors' attention on the disputed facts, but it presents the risk of conflicting answers. *See Guidry v. Kem Manufacturing Co.,* 598 F.2d 402, 405–06 (5th Cir.1979), *cert. denied,* 445 U.S. 929, 100 S.Ct. 1318, 63 L.Ed.2d 763 (1980). When answers apparently conflict, the reviewing court's duty is to reconcile the conflicts if possible in order to validate the jury verdict. *Griffin v. Matherne,* 471 F.2d 911, 915 (5th Cir.1973). When the answers cannot be reconciled "after a concerted effort," the court must grant a new trial. *Miller v. Royal Netherlands Steamship Co.,* 508 F.2d 1103, 1106 (5th Cir.1975).

The jury found that Southwest Bank knowingly employed false, misleading, or deceptive acts in dealing with Munn that caused Munn's damages. It also held that the bank unknowingly acted unconscionably toward Munn and thereby caused Munn's damages. Yet the jury inexplica-

bly awarded damages for the former behavior only and not for the latter.

In addition, the jury held that Southwest Bank was not guilty of fraud while holding that First National Bank of Midland was guilty of fraud in a stock transaction. This finding was made despite the jury's earlier finding that Southwest Bank was First National's agent in the transaction and despite the lack of evidence of First National's "fraud" outside of Southwest's action as First National's agent.

Finally, the jury found that Southwest Bank did not fraudulently induce Munn to sign the guaranty, that it did not engage in fraud or misrepresentations related to a stock transaction, and that it did not conceal material information. Yet the jury also found that the bank's unconscionable, false, misleading, or deceptive acts were producing causes of Munn's damages.

■ Munn would have us reconcile these findings on the grounds that substantial evidence exists to support the DTPA claims, and that the fraud claims and DTPA claims differ because fraud requires a showing of reliance on the misrepresentations while the DTPA requires only that the misrepresentations be a "producing cause" of damages. We have explained why we must remand the DTPA claims. All the claims are drawn from one set of facts and require that the jury be asked confusingly similar questions. A new trial of fewer than all the jury issues presents a substantial risk of an outcome never intended by the jury and judge. We have labored hard over the charge in an effort to comprehend its meaning. We have not succeeded in finding a reconciling principle that sheds light on what was asked and what was answered. As we see it, a new trial of all issues is the best course.

### IV

In summary, we hold that the district court should have submitted to the jury disputed facts about whether certain alleged services were objectives of the transaction. Thus, we remand for a new trial on the DTPA claims. Because the fraud claims against Southwest Bank and First National are so closely related to the DTPA claims and because of conflicts in the special verdict, we also remand those fraud claims for a new trial. Our holding leaves unresolved Munn's claims against Golden and Jones for damages. The district court is in the best position to reconsider its decision limiting recovery to rescission after the verdict in the new trial on remand. The judgment against Southwest Bank and First National is REVERSED, and the cause is REMANDED to the district court for further proceedings consistent with this opinion.

### ON PETITION FOR REHEARING

PER CURIAM:

IT IS ORDERED that the petition for rehearing filed in the above entitled and numbered cause be and the same is hereby GRANTED.

The district court entered judgment for the FDIC as receiver for the First National Bank of Midland. We reversed the district court's judgment as to Southwest Bank, including First National in that order, and remanded the case for further proceedings consistent with our opinion. The FDIC was not a party to the appeal. We amend our judgment so that it will properly reflect that the trial court's judgment that Munn take nothing from the FDIC is affirmed, it not being at issue on appeal.

Therefore the last paragraph of our opinion is amended to read as follows:

In summary, we hold that the district court should have submitted to the jury disputed facts about whether certain alleged services were objectives of the transaction. Thus, we remand for a new trial on the DTPA claims. Because the fraud claims against Southwest Bank are so closely related to the DTPA claims and because of conflicts in the special verdict, we also remand those fraud claims for a new trial. Our holding leaves unresolved Munn's claims against Golden and Jones for damages. The district court is in the best position to reconsider its decision limiting recovery to rescission after the verdict in the new trial on remand. The judgment against Southwest Bank is REVERSED, and the cause is REMANDED to the district court for further proceedings consistent with this opinion.