# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-02-00388-CV

**Eileen Bennett, Appellant**

**v.**

**Bank United; Patricia Lackey, as Escrow Manager of the Mortgage Loan Administration; First Bank National Association, as Trustee for the benefit of the holders of the First Boston Mortgage Securities Corporation Conduit Mortgage Pass-through Certificates Series and any other Holder of Plaintiff's Mortgage, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT NO. 99-11438, HONORABLE LORA LIVINGSTON, JUDGE PRESIDING**

## O P I N I O N

This appeal arises from a summary judgment granted in favor of appellees Bank United; Patricia Lackey, as Escrow Manager of the Mortgage Loan Administration ("Lackey"); First Bank National Association, as Trustee for the benefit of the holders of the First Boston Mortgage Securities Corporation Conduit Mortgage Pass-through Certificates Series and any other holder of appellant Eileen Bennett's mortgage, against appellant Eileen Bennett. For the reasons set out below, we will affirm the summary judgment.

**BACKGROUND**

In 1979 Bennett financed the purchase of a residence through Weyerhaeuser Mortgage Company ("Weyerhaeuser").[1] As part of the financing, Weyerhaeuser required that Bennett agree to reimburse Weyerhaeuser for the private mortgage insurance ("PMI") premiums on an insurance policy Weyerhaeuser obtained for its benefit. There were no provisions in the deed of trust permitting Bennett to terminate the PMI payments. Rather, the deed of trust stated that Bennett was required to include the amount as part of her monthly escrow payments "until the Note is paid in full," and to reimburse the premium amount "until such time as the requirement for such insurance terminates in accordance with Borrower's and Lender's written agreement or applicable law." The Mortgage Guaranty Insurance Corporation ("MGIC") issued the policy to Weyerhaeuser.[2]

Thereafter, Weyerhaeuser sold the Bennett loan to United Savings Association of Texas, which later changed its name to Bank United. Bank United then sold Bennett's loan and others to First Boston Capital Corporation ("First Boston Capital"), which in turn sold the mortgage loans to First Boston Mortgage Securities Corp. ("First Boston Mortgage"). Thereafter, First Boston

---

[1] Bennett and her then husband, Tony Lee Bennett, contracted with Weyerhaeuser. The two divorced before Bennett filed this action, and only Eileen Bennett is a party.

[2] Appellees assert that private mortgage insurance ("PMI") allows a less-qualified purchaser to secure a larger loan than the purchaser would have been able to afford. "Lenders often require [PMI] when making a residential mortgage loan that exceeds eighty percent (80%) of the loan-to-value ratio." "PMI insures the mortgagee for a certain percentage of the loan against any deficiency resulting from a borrower's default and thus makes the loan less risky" for the lender. PMI is not mandated by federal or state law. However, the Federal National Mortgage Association ("Fannie Mae") and the Federal National Home Loan Mortgage Corporation ("Freddie Mac") require PMI as a precondition for the purchase of the loans by these entities in the secondary-mortgage market. For a thorough discussion of the rationale behind PMI, *see White v. Mellon Mortgage Co.*, 995 S.W.2d 795, 797 (Tex. App.—Tyler 1999, no pet.).

Mortgage "securitized" the loans, including Bennett's, and transferred them to First Bank National Association as Trustee for the benefit of First Boston Conduit Mortgage Pass-through Certificates 1993-2 ("First Bank"). Despite all these transfers, Bank United remained responsible for servicing Bennett's loan for First Boston Mortgage. As a result of Bank United's sale of Bennett's loan to First Boston Capital and the subsequent sale to First Boston Mortgage, Bennett's loan became subject to a "Pooling and Servicing Agreement" and "Seller's Warranties and Servicing Agreement," which contained no provisions allowing for termination of the PMI.

After paying the premiums in accordance with the deed of trust for almost twenty years, in 1998 Bennett requested that Bank United discontinue charging for PMI because she had achieved a loan-to-value ratio of below eighty percent, a fact that is undisputed.[3] Bank United denied her request. Bennett spoke with Lackey, Bank United's mortgage escrow manager, who informed her that, under these circumstances, Bank United would normally waive the PMI. However, Bank United would not do so in Bennett's case because the holder of the deed of trust, First Boston Mortgage, refused to cancel the requirement.[4] In February 1999, Bank United informed

---

[3] Bennett argues that once the loan-to-value ratio falls below eighty percent, PMI is no longer necessary. She cites Fannie Mae and Freddie Mac "guidelines," which provide that a loan servicer must approve a mortgagor's written request to cancel PMI if the mortgagor has a satisfactory payment record that is never more than thirty days delinquent in a twelve-month period that precedes the request, and an unpaid balance of the mortgage is not greater than eighty percent of the property's value. Appellees respond that the guidelines do not mandate that it discontinue requiring PMI when the loan-to-value ratio is less than eighty percent.

[4] As a basis of its refusal to cancel Bennett's PMI requirement, First Boston Mortgage cites section 4.15 of "Seller's Warranties and Servicing Agreement." Section 4.15 states, in part:

> The Company shall not take any action that would result in loss of coverage under any applicable [PMI] Policy or any loss which, but for the actions of the

3

Bennett that $75.89 had been deducted from her escrow account for PMI payments. Bennett then brought this action, alleging, *inter alia*, violation of the Texas Deceptive Trade Practices Act ("DTPA"), *see* Tex. Bus. & Com. Code Ann. § 17.50 (West 2002), violation of the insurance code, fraud, and conversion. The district court granted appellees' motion for summary judgment, and Bennett appeals.

## DISCUSSION

In their traditional motion for summary judgment, appellees asserted a right to judgment as a matter of law. Tex. R. Civ. P. 166a(c). Because the propriety of summary judgment in this case is a question of law, we review the trial court's decision *de novo*. *See Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex. 1994); *McCarthy Bros. Co. v. Continental Lloyds Ins. Co.*, 7 S.W.3d 725, 728 (Tex. App.—Austin 1999, no pet.). The movant is required to disprove at least one element of each of the nonmovant's theories of recovery or to plead and conclusively establish an affirmative defense which defeats the nonmovant's cause of action. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 679 (Tex. 1979).

On appeal, Bennett argues that: (1) appellees acted unconscionably in violation of the DTPA and failed to provide a required statutory notice concerning PMI, (2) Bennett is a third-party beneficiary to the PMI contract between appellees and the insurer and is thus entitled to recover

Company, would have been covered thereunder or to the cancellation or refusal to renew any such [PMI] Policy, which is in effect at the date of the initial issuance of the Certificates and is required to be kept in force hereunder . . . .

for wrongful payment of PMI premiums from her escrow account, and (3) appellees engaged in unfair discrimination in violation of the insurance code.

**DTPA Violation**

By her first issue, Bennett argues that Bank United and First Boston Mortgage acted unconscionably and in violation of the DTPA when First Boston Mortgage, through Bank United, refused to cancel the PMI, despite Bank United's statement that it would usually curtail such a requirement for someone in Bennett's position. Appellees respond that Bennett is not a consumer for purposes of the DTPA and that even if she were, her claim fails because Bank United's actions were not unconscionable.

The DTPA mandates liberal construction to promote the underlying purpose of the act, to "protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection." Tex. Bus. & Com. Code Ann. § 17.44 (West 2002). A "consumer" under the DTPA is defined as "an individual, partnership, corporation, . . . who seeks or acquires, by purchase or lease, any goods or services." *Id*. § 17.45(4) (West 2002). To qualify as a consumer, the plaintiff (1) must seek or acquire goods or services by purchase[5] or lease, and (2)

---

[5] The plaintiff need not have purchased the goods or services directly from the defendant. "To accept the construction . . . that only direct purchasers can be consumers, would be to read additional or different language into the DTPA, in contravention of the Act's mandate of liberal construction. The legislature could easily have drafted such a restriction into the definition of 'consumer,' for example, by use of the words 'purchaser or lessee,' but did not do so." *Kennedy v. Sale*, 689 S.W.2d 890, 892 (Tex. 1985) (employee who received healthcare benefits from employer-selected plan was consumer as to healthcare insurance agent).

the goods or services purchased or leased must form the basis of the complaint. *Sherman Simon Enters., Inc. v. Lorac Serv. Corp.*, 724 S.W.2d 13, 14 (Tex. 1987). The purchase of services, in the context of the DTPA, has been defined as the actual transmission of services from one person to another by voluntary act or agreement, founded on valuable consideration. *Hall v. Bean*, 582 S.W.2d 263, 265 (Tex. Civ. App.—Beaumont 1979, no writ); *see also* Tex. Bus. & Com. Code Ann. § 17.45(2) (West 2002) ("'Services' means work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods."). A plaintiff's standing as a consumer is established by its relationship to the transaction, not by a contractual relationship with the defendant. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 814 (Tex. 1997); *Flenniken v. Longview Bank & Trust Co.*, 661 S.W.2d 705, 707 (Tex. 1983). Whether a plaintiff is a consumer under the DTPA is a question of law. *Holland Mortgage & Inv. Corp. v. Bone*, 751 S.W.2d 515, 517 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.).

Appellees argue that Bennett is not a consumer under the DTPA because she never "sought or obtained PMI"; it was her lender that sought and obtained the insurance. Appellees also contend that Bennett's agreement to reimburse the lender for the PMI premiums was "incidental to her loan obligations." *See Federal Deposit Ins. Corp. v. Munn*, 804 F.2d 860, 865 (5th Cir. 1986). Bennett responds that her objective was to purchase a residence and to facilitate that transaction, and her lender required her to pay the PMI premiums as part of the loan agreement.

In evaluating Bennett's consumer status, we examine whether her "objective" was the purchase or lease of a good or service. Tex. Bus. & Com. Code Ann. § 17.45 (West 2002); *see*

6

*also La Sara Grain Co. v. First Nat'l Bank*, 673 S.W.2d 558, 567 (Tex. 1984). The supreme court has examined this question in some detail. In *Flenniken*, the Flennikens contracted with Easterwood for the construction of a residence. 661 S.W.2d at 706. The Flennikens executed a mechanic's lien note, secured by a deed of trust, to Easterwood. *Id.* Easterwood assigned the note and contract lien to Longview Bank & Trust in return for the bank's commitment to provide interim construction financing. *Id.* The bank provided the financing, but Easterwood abandoned the project before completion. *Id.* As a result, the bank foreclosed on the Flennikens' property, and the Flennikens sued under the DTPA. *Id.* The bank argued that the Flennikens were not consumers under the DTPA, and the court of appeals agreed, holding that they were not consumers as to the transaction between Easterwood and the bank "because the purchase of the house and Easterwood's services did not form the basis of the complaint." *Id.* at 707. The supreme court reversed, holding that under the DTPA "the range of possible defendants is limited only by the exemptions provided in section 17.49," and that "[s]ection 17.50(a)(3) . . . allows a consumer to 'maintain an action if he has been adversely affected by . . . any unconscionable action or course of action by *any person*.'" *Id.* at 706 (quoting Act of May 10, 1973, 63d Leg., R.S., ch. 143, § 1, sec. 17.50, 1973 Tex. Gen. Laws 322, 327). In discussing the consumer's relationship to the other parties, the supreme court held that "privity between the plaintiff and defendant is not a consideration in deciding the plaintiff's status as a consumer under the DTPA." *Id.* at 707 (citing *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 541 (Tex. 1981)). Continuing, the *Flenniken* court observed:

> A plaintiff establishes his standing as a consumer in terms of his relationship to a transaction, not by a contractual relationship with the defendant. The only

7

> requirement is that the goods or services sought or acquired by the consumer form the basis of his complaint.

*Id.*

In *La Sara Grain*, the supreme court reaffirmed *Flenniken*, stating that "a lender may be subject to a DTPA claim if the borrower's 'objective' is the purchase or lease of a good or service thereby qualifying the borrower as a consumer." 673 S.W.2d at 567; *see also Knight v. International Harvester Credit Corp.*, 627 S.W.2d 382, 389 (Tex. 1982) (purchaser's "objective in the transaction was the purchase of a dump truck [and] . . . financing was merely the means of making that purchase"). The court also revisited its earlier decision in *Cameron*, stating that "the buyer was a DTPA consumer because of the purchase of the house; therefore, he could bring a DTPA action against anyone in the transaction who violated the act," which included the realtor. *La Sara Grain*, 673 S.W.2d at 566-67.

Appellees rely on *White v. Mellon Mortgage Co.* to support their argument that Bennett was not a consumer. 995 S.W.2d 795 (Tex. App.—Tyler 1999, no pet.). White purchased real estate from the Seymours and assumed a note and deed of trust that required her to pay PMI premiums for the benefit of the mortgagee. *Id.* at 801. White complained that the loan servicer, Mellon Mortgage, and Metropolitan Life Insurance Company, which had purchased the assumed note and deed of trust from the Seymours' original lender, violated the DTPA. *Id.* The court held that White was not a consumer because White confirmed that she neither sought Mellon's service of collecting PMI payments nor was it her objective to purchase PMI. *Id.* Here, Bennett alleges that she initially derived a benefit from PMI because she was "protected from any deficiency between

8

what her home sold for in the event of her death and the amount for which her home was sold," and that this benefit ensued until the loan-to-value ratio was reduced below eighty percent, at which time the PMI was no longer beneficial or necessary. Moreover, it is the purchase of the residence that is the basis of Bennett's complaint.

The *White* court's opinion makes no reference to *Flenniken*, and the cases are not easily reconcilable. *Compare White*, 995 S.W.2d at 801 (servicing agent's collection of PMI premiums for holder of note and deed of trust not service assumer of note and deed of trust "sought to purchase"), *with Flenniken*, 661 S.W.2d at 707 (purchaser of residence entitled to consumer status as to all parties "who sought to enjoy the benefits" of transaction, including lender). *White*, however, relies on *Munn* for the proposition that "goods or services must be an objective of the transaction, not merely incidental to it." *White*, 995 S.W.2d at 801 (citing *Munn*, 804 F.2d at 865). The *Munn* court concluded that *Flenniken* "represents the category of cases in which a loan is connected to the purchase of a good [a residence], which is the objective of the transaction." *Id.* Similarly, Bennett's objective was the purchase of a residence. Bennett executed a note and deed of trust incidental to the purchase, and Weyerhaeuser, the original lender, required PMI as a condition of the financing. Although the loan by itself was not a purchase of goods or services, it was incidental to the purchase of the residence—a good. *See id.* (citing *Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 175 (Tex. 1980)). As in *Munn*, Bennett's objective was to purchase the residence, and by virtue of becoming holders of her loan, appellees became connected to Bennett's transaction and subject to the DTPA's provisions. *See Cameron*, 618 S.W.2d at 541 ("The Act is designed to protect consumers from any deceptive trade practice made in connection with the purchase or lease of any goods or services.");

9

*see also Munn*, 804 F.2d at 865. Because the loan, with its requirement of PMI, was connected to the purchase of a good, we hold that Bennett is a consumer.

We now turn to Bennett's claim of unconscionable conduct. The DTPA defines an "unconscionable action or course of action" as one which "to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code Ann. § 17.45(5). To prove an unconscionable action or course of action, Bennett must show that appellees took advantage of her lack of knowledge and "'that the resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated.'" *Insurance Co. of N. Am. v. Morris*, 981 S.W.2d 667, 677 (Tex. 1998) (quoting *Chastain v. Koonce*, 700 S.W.2d 579, 584 (Tex. 1985)). The relevant inquiry examines the entire transaction, not only appellees' intent. *Chastain*, 700 S.W.2d at 583.

Bennett contends that Bank United's policies provided the opportunity for Bennett to cease paying PMI once she achieved twenty percent equity in her home, and appellees' refusal, after Bennett's request to discontinue the PMI requirement, was unconscionable. Appellees argue that there is no evidence of unconscionability, and that Bennett has demonstrated no harm because First Boston Mortgage was under no obligation to cancel the PMI. Appellees committed no "glaringly noticeable, flagrant, complete and unmitigated" action against Bennett. *Morris*, 981 S.W.2d at 677. First, we note that the deed of trust executed by Bennett provides for PMI premium reimbursement "until the Note is paid in full." Second, although Bank United expressed that it had a policy that *may* permit the canceling of a mortgagor's requirement to pay the PMI premiums, this policy had no effect on Bennett because it is undisputed that First Boston Mortgage held the

10

mortgage, and its policies were to the contrary. Finally, the practice of requiring a mortgagor to pay PMI premiums for the lender has long been used in the mortgage industry, and both Federal National Mortgage Association ("Fannie Mae") and Federal National Home Loan Mortgage Corporation ("Freddie Mac") require PMI when the loan-to-value ratio is greater than eighty percent before they will purchase a mortgage on the secondary market. We hold that no unconscionable action occurred.

Bennett's final argument concerning the DTPA is that appellees failed to provide her with written notice of her possible right to cancel the PMI and cease making the payments. *See* Tex. Ins. Code Ann. art. 21.50, § 1B(a) (West Supp. 2003).[6] Bennett argues that appellees failed to give her statutory notification of the possibility of cancelling the PMI. *Id.* Bennett alleges that she communicated with Bank United inquiring about cancellation of the PMI in September 1998 without any prompting from appellees.

---

[6] The insurance code provides, in pertinent part:

A lender that requires a borrower to purchase mortgage guaranty insurance shall provide annually to the borrower a copy of the following written notice printed in at least 10-point bold-faced type:

"NOTICE OF RIGHT TO CANCEL PRIVATE MORTGAGE INSURANCE: If you currently pay private mortgage insurance premiums, you may have the right to cancel the insurance and cease paying premiums. This would permit you to make a lower total monthly mortgage payment and to possibly receive a refund of any unearned premiums on the policy. In most cases, you have the right to cancel private mortgage insurance if the principal balance of your loan is 80 percent or less of the current fair market appraised value of your home. If you want to learn whether you are eligible to cancel this insurance, please contact us at (address and telephone number of lender) or the Texas Department of Insurance consumer help line at (the appropriate toll-free telephone number)."

Tex. Ins. Code Ann. art. 21.50, § 1B(a) (West Supp. 2003).

The failure to "disclose any matter required by law to be disclosed, including a failure to make disclosure in accordance with another provision of [the insurance] code" constitutes misrepresenting an insurance policy.[7] *Id.* art. 21.21, § 4(11)(e) (West Supp. 2003). Bennett contends that such a failure is actionable under section 17.50 of the DTPA. *See* Tex. Bus. & Com. Code Ann. § 17.50(a)(4) (consumer may maintain action where "the use or employment by any person of an act or practice in violation of Article 21.21, Insurance Code" constitutes "a producing cause of economic damages or damages for mental anguish"). Appellees conceded, for purposes of their motion for summary judgment, that "the alleged failure to notify will assumed to be true." Appellees also argue on appeal and in their motion for summary judgment, that even if Bennett is held to be a consumer, appellees were "still under no obligation to terminate the PMI [and] [t]herefore, Bennett has not been damaged," by the lack of an article 21.50 notice of a "possibility."

Bennett argues that appellees' article 21.50 issue "stands unchallenged" and, therefore, she "is entitled to attempt to prove her claim and recover not only damages, but an injunction." In her motion for summary judgment, Bennett argued that appellees' failure to provide the article 21.50 notification was a breach of their fiduciary duty as to Bennett's escrow account, from which Bank United debited the unnecessary PMI premium of $75.89. This action, Bennett argued, was contrary to her wishes. However, Bennett alleged no specific damages with regard to the article 21.50 violation. Rather, she argued that "[s]uch failure constituted an overtly unlawful act thus constituting a conspiracy between [appellees] to deprive [her of] notice."

---

[7] We presume without deciding that the use of "disclose" and "disclosure" in article 21.21, § 4(11)(e) is the same as "notice" in article 21.50. *Compare* Tex. Ins. Code Ann. art. 21.21, § 4(11)(e) (West Supp 2003), *with* Tex. Ins. Code Ann. art. 21.50, § 1B (West Supp. 2003).

12

In the deed of trust, Bennett expressly agreed to pay the PMI premiums "until the Note is paid in full." Because she *expressly agreed* to pay PMI premiums as they became due and payable, she could suffer no injury from having to live up to her part of the bargain. *See White*, 995 S.W.2d at 801. We agree with the *White* court that "when a mortgagor and mortgagee contract for the mortgagor to pay PMI premiums for the life of the loan, even if not 'necessary,' there is no deceptive practice as a matter of law. The parties are free to contract for such insurance . . . ." *Id.* at 800. Therefore, we hold that Bank United and First Boston Mortgage did not act unconscionably, and we overrule Bennett's first issue.

**Bennett's Third-Party-Beneficiary Status**

By her second issue, Bennett argues that she was a third-party beneficiary to the insurance contract, entitling her to recover for the wrongful payment of PMI premiums from her escrow account. Appellees contend that this is not a breach-of-contract action and that Bennett is not seeking to enforce the PMI; therefore, her third-party-beneficiary argument is unavailing.

The fact that a person might receive an incidental benefit from a contract to which she is not a party does not give her a right of action to enforce the contract. *MCI Telecomm. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999). A third party may recover on a contract made between other parties only if the parties entered into the contract directly for the third party's benefit. *Id.* To qualify as one for whose benefit the contract was made, the third party must show that she is either a donee or creditor beneficiary of, and not one who is benefited only incidentally by the performance of the contract. *Id.* In determining whether a third party can enforce a contract, the intention of the contracting parties is controlling. *Id.* A court will not create a third-party-

13

beneficiary contract by implication. *Id.* The intention to contract or confer a direct benefit to a third party must be clearly and fully spelled out, or enforcement by the third party must be denied. *Id.* Consequently, a presumption exists that parties contracted for themselves unless it "clearly appears" that they intended a third party to benefit from the contract. *Id.*

Bennett's argument fails for two reasons: (1) Bennett is incidently not directly benefited by the PMI and (2) Bennett is not seeking to enforce the PMI contract provision. First, Bennett is not an intended beneficiary of the PMI, although she may have initially and incidently benefited from the insurance. The record indicates that Weyerhaeuser entered into the insurance contract with MGIC for Weyerhaeuser's benefit not Bennett's, and appellees are the subsequent direct beneficiaries of the insurance contract. Although the insurance contract is not in the record, no party alleges that the contract clearly spells out a direct benefit to Bennett.

Second, Bennett is not claiming that she is a third-party beneficiary in order to enforce the PMI contract. Rather, she is claiming third-party-beneficiary status in order to achieve standing to sue for violations of the DTPA. Bennett relies on *Palma v. Verex Assurance, Inc.* for this proposition. 79 F.3d 1453 (5th Cir. 1996). In *Palma*, Palma received a loan to purchase a condominium, and the lender required PMI, which Palma paid. *Id.* at 1454. Palma defaulted on the mortgage and the mortgage holder foreclosed and demanded the deficiency. *Id.* at 1454-55. Palma filed suit against the private mortgage insurer, alleging that pursuit of the deficiency violated the terms of the mortgage insurance policy. *Id.* at 1455. As to the question of whether the insurance contract benefited Palma, the court, interpreting the contract language, held that it did. *Id.* at 1458. Bennett's case is distinguishable because she presents no allegations that the contract language in

14

any way indicates that the contract is to her benefit. Instead, Bennett contends that when the loan-to-value ratio was greater than eighty percent, the PMI benefited her in the event of her death and the sale of her home. Moreover, while the *Palma* court was able to examine the insurance contract, appellees' insurance contract is not part of the record for our review. Therefore, the presumption prevails that Weyerhaeuser and MGIC contracted for their benefit alone (and subsequently the benefit of Weyerhaeuser's successors) and Bennett's claim fails. We overrule Bennett's second issue.

**Texas Insurance Code Violation**

By her third issue, Bennett argues that appellees are engaged in the business of insurance and as such have violated insurance code article 21.21-8 by engaging in unfair discrimination. *See* Tex. Ins. Code Ann. art. 21.21-8 (West Supp. 2003). Specifically, Bennett contends that appellees, in collecting the PMI premiums, are acting as MGIC's agent, as defined in article 21.02 of the insurance code. *See id.* art. 21.02 (West Supp. 2003). Therefore, as an agent, appellees are engaging in the practice of insurance and conducting discriminating practices by requiring Bennett to pay her contractually agreed-to premiums while it waives these payments for similarly-situated borrowers. Appellees argue, *inter alia*, that they are not engaged in the business of insurance and, therefore, are not an agent of MGIC. Moreover, appellees argue that Bennett is not a policyholder, and thus she cannot maintain an action under article 21.21. We hold that Bennett is not a policyholder and that she may not bring an action under article 21.21, and appellees are not agents for MGIC.

15

Weyerhaeuser obtained the PMI policy from MGIC, requiring Bennett to reimburse Weyerhaeuser for the premium.[8]  When appellees, in turn, each became holders of Bennett's loan, they each became the policyholder, and Bank United continued to collect Bennett's mortgage payment, which included an amount to reimburse appellees for the PMI premium they paid to MGIC. Therefore, appellees are not acting as agents for MGIC because they do not "receive, or collect, or transmit any premium of insurance . . . or do or perform any other act or thing in the making or consummating of any contract of insurance for or with any such insurance company other than for himself." *Id.*  Weyerhaeuser purchased the policy to protect itself in the event Bennett defaulted on the mortgage.  Weyerhaeuser did not act as an agent for MGIC in providing the policy for Bennett because Bennett is not the policyholder. Moreover, because she is not a policyholder, Bennett does not have standing to pursue the antidiscrimination provisions of insurance code article 21.21-8. *Allstate Ins. Co. v. Watson*, 876 S.W.2d 145, 150 (Tex. 1994) (claims for unfair settlement practices, under article 21.21, could be brought only by policyholders); *In re Valetutto*, 976 S.W.2d 893, 895 (Tex. App.—Austin 1998, no pet.) (nonpolicyholders do not have standing to sue under article 21.21-8).  For all these reasons, we overrule Bennett's third issue.

---

[8] The Premium Payment Authorization form stated that:

> For valuable consideration, the undersigned [Bennett and her former husband] agree that Weyerhaeuser [] mortgagee, may at any time during the mortgage term, and in its discretion . . . pay the premiums due by reason thereof, and require repayment [by] the undersigned of such amounts as are advanced by said mortgagee.  In the event [of] failure by the undersigned to repay said amounts to said mortgagee, such failure shall be considered a default . . . ."

16

## CONCLUSION

Having overruled all of Bennett's issues, we affirm the district court's grant of summary judgment for appellees.

_____

Lee Yeakel, Justice

Before Justices Kidd, B. A. Smith and Yeakel

Affirmed

Filed:   July 11, 2003